# EXHIBIT

# 2

Supreme Court, U.S.
FILED

DEC 2 2 2009

OFFICE OF THE CLERK

**Nos. 08-1498 and 09-89**

# In the Supreme Court of the United States

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

HUMANITARIAN LAW PROJECT, ET AL.

HUMANITARIAN LAW PROJECT, ET AL.,
CROSS-PETITIONERS

*v.*

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

*ON WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**BRIEF FOR THE RESPONDENTS**

ELENA KAGAN
 *Solicitor General
  Counsel of Record*
TONY WEST
 *Assistant Attorney General*
NEAL KUMAR KATYAL
 *Deputy Solicitor General*
JEFFREY B. WALL
 *Assistant to the Solicitor
  General*
DOUGLAS N. LETTER
JOSHUA WALDMAN
 *Attorneys*

 *Department of Justice
 Washington, D.C. 20530-0001
 (202) 514-2217*

Blank Page

## QUESTION PRESENTED

Whether 18 U.S.C. 2339B(a)(1), which prohibits the knowing provision of "any * * * service, * * * training, expert advice or assistance, * * * [or] personnel," 18 U.S.C. 2339A(b)(1), to a designated foreign terrorist organization, violates the First and Fifth Amendments.

(I)

Blank Page

**TABLE OF CONTENTS**

Page

Opinions below .......................................... 1
Jurisdiction ............................................. 2
Constitutional and statutory provisions involved ........... 2
Statement .............................................. 2
Summary of argument ................................. 13
Argument:
   I.   The material-support statute's restrictions on
       providing aid to known terrorist organizations
       do not violate the Fifth Amendment .............. 16
       A.   The statute's terms are sufficiently clear
           to provide notice to persons of ordinary
           intelligence ............................... 16
           1.   Instructing the PKK and LTTE on
               how to engage in international politi-
               cal advocacy constitutes "training"  ...... 19
           2.   Consulting with the PKK and LTTE
               on international law, medical care,
               and economic development consti-
               tutes "expert advice or assistance" ....... 27
           3.   Providing persons to work under the
               direction or control of the PKK and
               LTTE constitutes "personnel"  .......... 34
           4.   Helping the PKK and LTTE appear
               before national and international
               representative bodies constitutes
               "services" ........................... 38
       B.   The court of appeals confused the vague-
           ness and overbreadth doctrines  ............ 42
  II.   The material-support statute's restrictions on
      providing aid to known terrorist organizations
      do not violate the First Amendment .............. 43

(III)

IV

Table of Contents—Continued                     Page

A.  The statute is a regulation of conduct
    that only incidentally and permissibly
    affects expression ........................ 44
    1.  Section 2339B regulates conduct
        without regard to its expressive
        content ........................... 44
    2.  Petitioners' arguments that Section
        2339B is a content-based restriction
        on speech are meritless ............... 49
    3.  Section 2339B is narrowly tailored
        to advance important governmental
        interests ........................... 52
B.  The statute is not overbroad ............... 57
C.  The statute does not infringe petitioners'
    right of association ....................... 59
III. The material-support statute's restrictions on pro-
     viding aid do not require specific intent to further
     the terrorist organization's unlawful activities ..... 62
Conclusion ........................................ 67

**TABLE OF AUTHORITIES**

Cases:

*American Commc'ns Ass'n* v. *Douds*, 339 U.S. 382
    (1950) .................................... 25, 32
*Board of Governors of the Fed. Reserve Sys.* v.
    *Agnew*, 329 U.S. 441 (1947) ...................... 24
*Boim* v. *Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008), cert. denied,
    130 S. Ct. 458 (2009) ........................ 48, 56

V

Cases—Continued:                                      Page

   *Boim* v. *Quranic Literacy Inst.*, 291 F.3d 1000
     (7th Cir. 2002) ................................. 48

   *Boy Scouts of Am.* v. *Dale*, 530 U.S. 640 (2000) ......... 61

   *California Teachers Ass'n* v. *State Bd. of Educ.*,
     271 F.3d 1141 (9th Cir. 2001) ..................... 20

   *Cannon* v. *University of Chi.*, 441 U.S. 677 (1979) ...... 65

   *Carter* v. *United States*, 530 U.S. 255 (2000) ........... 66

   *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105
     (2001) .......................................... 30

   *City of Erie* v. *Pap's A.M.*, 529 U.S. 277 (2000) ......... 37

   *City of L.A.* v. *Alameda Books, Inc.*, 535 U.S. 425
     (2002) .......................................... 46

   *Coates* v. *City of Cincinnati*, 402 U.S. 611 (1971) ....... 31

   *Cohen* v. *California*, 403 U.S. 15 (1971) ............... 45

   *Cox Broad. Corp.* v. *Cohn*, 420 U.S. 469 (1975) ......... 45

   *DKT Mem'l Fund Ltd.* v. *Agency for Int'l Dev.*,
     887 F.2d 175 (D.C. Cir. 1989) ..................... 52

   *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579
     (1993) .......................................... 29

   *De Jonge* v. *Oregon*, 299 U.S. 353 (1937) ............ 60, 61

   *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast
     Bldg. & Constr. Trades Council*, 485 U.S. 568
     (1988) .......................................... 40

   *Elrod* v. *Burns*, 427 U.S. 347 (1976) ................. 61

   *FCC* v. *Fox Television Stations, Inc.*, 129 S.Ct. 1800
     (2009) .......................................... 63

   *FCC* v. *League of Women Voters*, 468 U.S. 364 (1984) ... 49

   *Fisher* v. *City of Berkeley*, 475 U.S. 260 (1986) ......... 35

   *Gentile* v. *State Bar*, 501 U.S. 1030 (1991) .......... 23, 24

VI

Cases—Continued:                                             Page

*Grayned* v. *City of Rockford*, 408 U.S. 104
(1972) ................................... 16, 17, 25, 43

*Gustafson* v. *Alloyd Co.*, 513 U.S. 561 (1995) ............ 39

*Haig* v. *Agee*, 453 U.S. 280 (1981) .................... 57

*Harris* v. *United States*, 536 U.S. 545 (2002) ............ 41

*Hill* v. *Colorado*, 530 U.S. 703 (2000) ............. 18, 25, 51

*Humanitarian Law Project* v. *Ashcroft:*
532 U.S. 904 (2001) ................................ 9
309 F. Supp. 2d 1185 (C.D. Cal. 2004), vacated,
No. 04-55871 (9th Cir. Apr. 1, 2005) ............. 9, 10

*Humanitarian Law Project* v. *Gonzales*,
No. 04-55871 (9th Cir. Apr. 1, 2005) ................ 10

*Humanitarian Law Project* v. *Reno:*
205 F.3d 1130 (9th Cir. 2000), cert. denied,
532 U.S. 904 (2001) ...................... *passim*
9 F. Supp. 2d 1205 (C.D. Cal. 1998), aff'd,
205 F.3d 1130 (9th Cir. 2000), cert. denied,
532 U.S. 904 (2001) ............................ 8
9 F. Supp. 2d 1176 (C.D. Cal. 1998), aff'd,
205 F.3d 1130 (9th Cir. 2000), cert. denied,
532 U.S. 904 (2001) ........................ 5, 7, 8

*Humanitarian Law Project* v. *United States Trea-
sury Dep't*, 578 F.3d 1133 (9th Cir. 2009) ............ 38

*James* v. *United States*, 550 U.S. 192 (2007) ........... 24

*Jarecki* v. *G.D. Searle & Co.*, 367 U.S. 303 (1961) ....... 39

*Keyishian* v. *Board of Regents of the Univ. of
the State of N.Y.*, 385 U.S. 589 (1967) ............... 60

*Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137
(1999) ................................... 29, 32, 33

VII

Cases—Continued: Page

*Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525 (2001) . . . . 47

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) . . . . . . . . . . . . 43

*McConnell* v. *Federal Election Comm'n*, 540 U.S. 93
(2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334
(1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752
(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Morissette* v. *United States*, 342 U.S. 246 (1952) . . . . . . . . 30

*NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886
(1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*NCAA* v. *Smith*, 525 U.S. 459 (1999) . . . . . . . . . . . . . . . . . . 63

*Noto* v. *United States*, 367 U.S. 290 (1961) . . . . . . . . . . . . . 60

*Parker* v. *Levy*, 417 U.S. 733 (1974) . . . . . . . . . . . . . 19, 26, 34

*People's Mojahedin Org. of Iran* v. *Department
of State*, 327 F.3d 1238 (D.C. Cir. 2003) . . . . . . . . . . . . 48

*People's Mojahedin Org. of Iran* v. *United States
Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999),
cert. denied, 529 U.S. 1104 (2000) . . . . . . . . . . . . . . 5, 6, 50

*Pierce* v. *Underwood*, 487 U.S. 552 (1988) . . . . . . . . . . 21, 24

*Posters 'N' Things, Ltd.* v. *United States*,
511 U.S. 513 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Raley* v. *Ohio*, 360 U.S. 423 (1959) . . . . . . . . . . . . . . . . . . . . 40

*Regan* v. *Wald*, 468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . 57

*Reno* v. *ACLU*, 521 U.S. 844 (1997) . . . . . . . . . . . . . . . . 31, 45

*Scales* v. *United States*, 367 U.S. 203 (1961) . . . 36, 64, 65, 66

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . 62

*Staples* v. *United States*, 511 U.S. 600 (1994) . . . . . . . . . . . 64

VIII

Cases—Continued:                                              Page

*Taylor* v. *Louisiana*, 419 U.S. 522 (1975) . . . . . . . . . . . . . . 33

*Third Nat'l Bank* v. *Impac Ltd.*, 432 U.S. 312 (1977) . . . . 30

*Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180 (1997) . . . 49

*United States* v. *Al-Arian*, 308 F. Supp. 2d 1322
    (M.D. Fla. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States* v. *Albertini*, 472 U.S. 675 (1985) . . . . . . 46, 52

*United States* v. *Alves*, 317 F. Supp. 2d 65
    (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Assi*, 414 F. Supp. 2d 707
    (E.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States* v. *Awan*, 459 F. Supp. 2d 167
    (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 58

*United States* v. *Balint*, 258 U.S. 250 (1922) . . . . . . . . . . . 64

*United States* v. *Bestfoods*, 524 U.S. 51 (1998) . . . . . . . . . . 63

*United States* v. *Cardiff*, 344 U.S. 174 (1952) . . . . . . . . . . . 40

*United States* v. *Goba*, 220 F. Supp. 2d 182
    (W.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States* v. *Hammoud*, 381 F.3d 316 (4th Cir.
    2004), vacated on other grounds, 543 U.S. 1097,
    reinstated in relevant part, 405 F.3d 1034
    (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 48, 52, 54, 58, 59, 65

*United States* v. *Hescorp, Heavy Equip. Sales Corp.*,
    801 F.3d 70 (2d Cir.), cert. denied, 479 U.S. 1018
    (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States* v. *Kandasamy*, No. 06 CR 616 (RJD),
    2008 WL 2660610 (E.D.N.Y. July 3, 2008),
    aff'd, No. 08-3589-CR, 2009 WL 692113
    (2d Cir. Mar. 18, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

IX

Cases—Continued:                                    Page

*United States* v. *Kassir*, No. 04 CR 356 (JFK),
   2009 WL 2913651 (S.D.N.Y. Sept. 11, 2009) . . . . . . . . . 53
*United States* v. *Lindh*, 212 F. Supp. 2d 541
   (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*United States* v. *Marzook*, 383 F. Supp. 2d 2056
   (N.D. Ill. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 58
*United States* v. *Moses*, 137 F.3d 894 (6th Cir. 1998) . . . . 27
*United States* v. *O'Brien*, 391 U.S. 367
   (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 49, 52, 53
*United States* v. *Osman*, No. 1:06-cr-00416-CCB-1
   (D. Md. Oct. 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*United States* v. *Riverside Bayview Homes, Inc.*,
   474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
*United States* v. *Robel*, 389 U.S. 258 (1967) . . . . . . . . . . . . 60
*United States* v. *Sattar*, 272 F. Supp. 2d 348
   (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 58
*United States* v. *Shah*, 474 F. Supp. 2d 492
   (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 58
*United States* v. *Taleb-Jedi*, 566 F. Supp. 2d 157
   (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 54, 58
*United States* v. *Warsame*, 537 F. Supp. 2d 1005
   (D. Minn. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 58, 65
*United States* v. *Williams*, 128 S. Ct. 1830
   (2008) . . . . . . . . . . . . . . . . . . 14, 18, 24, 25, 31, 32, 36, 42, 57
*United States ex rel. the Attorney General of the
   United States* v. *Delaware & Hudson Co.*,
   213 U.S. 366 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*Village of Hoffman Estates* v. *Flipside, Hoffman
   Estates, Inc.*, 455 U.S. 489 (1982) . . . . . . . . . 18, 19, 26, 34

X

Cases—Continued:                                    Page

    *Virginia* v. *Hicks*, 539 U.S. 113 (2003)  ....... 43, 57, 58, 59

    *Ward* v. *Rock Against Racism*, 491 U.S. 781
       (1989) .................................... 18, 48, 51

    *Wayte* v. *United States*, 470 U.S. 598 (1985)  ........ 49, 53

Constitution, statutes, sentencing guidelines and rule:

    U.S. Const.:

       Art. I, § 8, Cl. 16  ............................... 20

       Amend. I ................................. *passim*

       Amend. V  .................... 2, 13, 15, 16, 43, 62, 63

          Due Process Clause ....................... 16, 62

    Antiterrorism and Effective Death Penalty Act of
       1996, Pub. L. No. 104-132, 110 Stat. 1214  ............ 2

       § 301(a)(7), 110 Stat. 1214 ...................... 54

    Intelligence Reform and Terrorism Prevention Act of
       2004, Pub. L. No. 108-458, § 6603(c), 118 Stat. 3762 .... 3

    Sherman Act, 15 U.S.C. 1 (§ 1) ....................... 35

    Smith Act, 18 U.S.C. 2385 ........................... 65

    5 U.S.C. 3323(d)  ................................. 28

    5 U.S.C. 4103(a)  ................................. 20

    5 U.S.C. App. 2(a) at 455 ........................... 28

    6 U.S.C. 236(e)(2)(A)  ............................. 28

    8 U.S.C. 1182(a)(3)(B)  ............................. 3

    8 U.S.C. 1182(a)(3)(B)(iv)(VI) ...................... 20

    8 U.S.C. 1189(a)(1) .............................. 3, 50

    8 U.S.C. 1189(c)  ............................... 3, 59

    8 U.S.C. 1189(d)(4) ................................ 3

    10 U.S.C. 373(2)  ................................. 28

XI

Statutes, sentencing guidelines and rule—Continued:

12 U.S.C. 1828(*l*) ................................... 23

15 U.S.C. 3116 ...................................... 20

18 U.S.C. 175b(d)(2)(G) ............................. 35

18 U.S.C. 225(a)(1) ................................. 35

18 U.S.C. 951(d) ................................... 35

18 U.S.C. 1169(b)(1) ............................... 35

18 U.S.C. 1960(a) .................................. 35

18 U.S.C. 2339A .............................. 46, 64

18 U.S.C. 2339A(a) ................................ 64

18 U.S.C. 2339A(b)(1) ......... 4, 13, 17 , 20, 32, 39, 46, 51

18 U.S.C. 2339A(b)(2) ........................... 4, 21

18 U.S.C. 2339A(b)(3) .................. 4, 11, 29, 31, 32

18 U.S.C. 2339B ............................ *passim*

18 U.S.C. 2339B(a) ................................ 10

18 U.S.C. 2339B(a)(1) .............. 3, 4, 13, 22, 32, 39, 64

18 U.S.C. 2339B(h) .................. 4, 12, 35, 36, 37, 38

18 U.S.C. 2339C ................................... 64

18 U.S.C. 2339C(a)(1) .............................. 64

18 U.S.C. 3509(b)(1)(B)(ii) ......................... 27

20 U.S.C. 954a(b) ................................. 20

22 U.S.C. 2770a(a) ................................ 20

22 U.S.C. 7423(e) ................................. 20

22 U.S.C. 7432(12) ................................ 20

22 U.S.C. 7611(b)(3)(A) ............................ 23

25 U.S.C. 2218(g) ................................. 23

42 U.S.C. 6864a(b)(3) .............................. 28

42 U.S.C. 9840a ................................... 20

XII

Statutes, sentencing guidelines and rule—Continued:

    42 U.S.C. 15025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    47 U.S.C. 504(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    United States Sentencing Guidelines:

        § 3B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        § 3B1.3, comment. (n.4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 29, 33

Miscellaneous:

    H.R. Rep. No. 383, 104th Cong., 1st Sess.
        (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 59, 60

    *Merriam-Webster's Collegiate Dictionary* (11th ed.
        2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

    *The American Heritage Dictionary of the English
        Language*:

        (3d ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        (4th ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

    *The Random House Dictionary of the English
        Language* (2d ed. 1987) . . . . . . . . . . . . . . . . . . . . . . . 20, 27

    United States Court of Appeals for the Ninth Circuit,
        *Media for Case: Humanitarian Law Pro v. Gon-
        zales, No. 02-55082* (Dec. 14, 2004) <http://www.
        ca9.uscourts.gov/media/view_subpage.php?pk_id=
        0000004506> . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 37, 57

    *Webster's Third New International Dictionary of
        the English Language* (1993) . . . 19, 22, 27, 31, 34, 38, 40

# In the Supreme Court of the United States

---

No. 08-1498

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

HUMANITARIAN LAW PROJECT, ET AL.

---

No. 09-89

HUMANITARIAN LAW PROJECT, ET AL.,
CROSS-PETITIONERS

*v.*

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

---

*ON WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

---

**BRIEF FOR THE RESPONDENTS**

---

**OPINIONS BELOW**

The opinion of the court of appeals (Pet. App. 1a-32a) is reported at 552 F.3d 916. Earlier opinions of the court of appeals are reported at 393 F.3d 902, 352 F.3d 382, and 205 F.3d 1130. The opinion of the district court (Pet. App. 33a-76a) is reported at 380 F. Supp. 2d 1134. Earlier opinions of the district court are reported at 309 F. Supp. 2d 1185, 9 F. Supp. 2d 1205, and 9 F. Supp. 2d 1176.

(1)

2

## JURISDICTION

The judgment of the court of appeals was entered on December 10, 2007. A petition for rehearing was denied on January 5, 2009 (Pet. App. 2a-3a). On March 24, 2009, Justice Kennedy extended the time within which to file a petition for a writ of certiorari to and including May 5, 2009. On April 22, 2009, Justice Kennedy further extended the time to June 4, 2009, and the petition in No. 08-1498 was filed on that date. A conditional cross-petition for a writ of certiorari was filed on July 6, 2009 (Monday). The petitions for writs of certiorari were granted on September 30, 2009. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment to the United States Constitution provides in relevant part that "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fifth Amendment to the United States Constitution provides in relevant part that "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law." The pertinent statutory provisions are reprinted in an appendix to this brief.

## STATEMENT

1. This case involves a constitutional challenge to provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, that serve as crucial tools in America's fight against terrorism. The statute authorizes the Secretary of State, in consultation with the Secretary of the Trea-

3

sury and the Attorney General, to designate an entity as a "foreign terrorist organization" if she finds (1) that "the organization is a foreign organization"; (2) that "the organization engages in terrorist activity," as defined in 8 U.S.C. 1182(a)(3)(B); and (3) that the organization's terrorist activity "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. 1189(a)(1) and (d)(4). An organization may seek judicial review of its designation by filing a petition for review in the District of Columbia Circuit. 8 U.S.C. 1189(c).

It is a criminal offense for any person within the United States or subject to its jurisdiction "knowingly" to provide "material support or resources" to a designated foreign terrorist organization. 18 U.S.C. 2339B(a)(1). The statute defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Ibid.*

In the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), Pub. L. No. 108-458, § 6603(c), 118 Stat. 3762, Congress clarified several provisions of Section 2339B. In particular, IRTPA specified that in order to "knowingly" violate the material-support statute, a person "must have knowledge that the organiza-

4

tion is a designated terrorist organization" or "that the organization has engaged or engages in terrorist activity." 18 U.S.C. 2339B(a)(1). Section 2339B thus prohibits a person with such knowledge from providing material support or resources to a designated terrorist organization.

IRTPA also amended the definition of "material support and resources" in four ways. First, it included an additional ban on the knowing provision of any "service" to a designated terrorist organization. 18 U.S.C. 2339A(b)(1). Second, it defined the term "training" to mean "instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. 2339A(b)(2). Third, it defined "expert advice or assistance" to mean "advice or assistance derived from scientific, technical or other specialized knowledge." 18 U.S.C. 2339A(b)(3). Fourth, it placed strict limits on prosecutions based on providing "personnel":

> No person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. 2339B(h).

5

Since 2001, the United States has charged approximately 150 defendants with violations of the material-support provision of 18 U.S.C. 2339B, and to date approximately 75 defendants have been convicted. Several of those prosecutions have involved the provision of "training," "expert advice or assistance, "personnel," or "service" to terrorist organizations. See, *e.g.*, [Superseding] Indictment at 4-5, *United States* v. *Iqbal*, No. 1:06-cr-01054 (S.D.N.Y. filed June 20, 2007) (defendants were charged under Section 2339B with providing satellite-television services to Hizballah; defendants pleaded guilty); [Third Superseding] Indictment at 1-2, *United States* v. *Shah*, 474 F. Supp. 2d 492 (S.D.N.Y. 2007) (No. 1:05-cr-00673) (defendants were charged under Section 2339B with providing al Qaeda "martial arts training and instruction"; one defendant pleaded guilty and the other was found guilty after a jury trial). Some of those cases have involved the provision of material support to one of the terrorist organizations at issue here. See, *e.g.*, *United States* v. *Osman*, No. 1:06-cr-00416-CCB-1 (D. Md. Oct. 31, 2008); *United States* v. *Sarachandran*, No. 1:06-cr-00615-RJD-1 (E.D.N.Y. guilty plea entered Jan. 26, 2009); *United States* v. *Thavaraja*, No. 1:06-cr-00616-RJD-JO-1 (E.D.N.Y. guilty plea entered June 9, 2009).

2. The Secretary of State has designated the Kurdistan Workers' Party (PKK) and the Liberation Tigers of Tamil Eelam (Tamil Tigers or LTTE) as foreign terrorist organizations. The PKK has never sought judicial review of its designation. See *Humanitarian Law Project* v. *Reno*, 9 F. Supp. 2d 1176, 1180 (C.D. Cal. 1998). The LTTE sought judicial review, but the District of Columbia Circuit upheld its designation. See *People's Mojahedin Org. of Iran* v. *United States Dep't of State*,

6

182 F.3d 17 (D.C. Cir. 1999), cert. denied, 529 U.S. 1104 (2000).

a.  The PKK was founded in 1974 for the purpose of establishing an independent Kurdish state in southeastern Turkey.  Since its inception, the organization has waged a violent insurgency that has claimed over 22,000 lives.  In the 1990s, the PKK conducted terrorist attacks on Turkish targets throughout Western Europe; it also targeted areas of Turkey frequented by tourists.  For instance, in 1996, PKK members hijacked a bus in Turkey and kidnapped two passengers, one of whom was a United States citizen.  Earlier, the PKK claimed responsibility for a series of bombings in Istanbul that killed two people and wounded at least ten others, including a United States citizen.  In 1993, the PKK firebombed five sites in London.  In a separate incident that year, it kidnapped tourists from the United States and New Zealand and held them hostage.  J.A. 128-130.

b.  The Tamil Tigers were founded in 1976 for the purpose of creating an independent Tamil state in Sri Lanka.  J.A. 130.  The organization has used suicide bombings and political assassinations in its campaign for independence, killing hundreds of civilians in the process.  J.A. 130-133; see *People's Mojahedin Org. of Iran*, 182 F.3d at 19-20.  In 1996, the Tamil Tigers exploded a truck bomb at the Central Bank in Colombo, Sri Lanka, killing 100 people and injuring more than 1400.  J.A. 131.  The following year, the group exploded another truck bomb near the World Trade Center in central Colombo, injuring 100 people, including 7 United States citizens.  J.A. 130-131.  In 1998, a Tamil Tiger suicide bomber exploded a car bomb in Maradana, Sri Lanka, killing 37 people and injuring more than 238 others.  J.A. 130.  In addition, throughout the 1990s, the Tamil Tigers carried

7

out several attacks on Sri Lankan government officials, killing the President, the Security Minister, and the Deputy Defense Minister. J.A. 132.

3. Petitioners are two United States citizens and five domestic organizations who wish to provide support for what they say are lawful, nonviolent activities of the PKK and the Tamil Tigers.[1] Petitioners brought two separate actions, eventually consolidated in the district court, challenging the constitutionality of the material-support statute.

a. In the first action, petitioners raised several constitutional challenges, including that the material-support statute impermissibly violates their First Amendment association rights. The district court rejected that claim, noting that the statute does not directly target First Amendment interests because a terrorist designation is "not founded on the political viewpoints or subject matter that the organizations promote. Rather, the designation is based on whether the organization engages in terrorist activity." *Humanitarian Law Project*, 9 F. Supp. 2d at 1191. "More importantly," the court held, the material-support statute "does not criminalize *mere* association with designated terrorist organizations" and "does not prevent [petitioners] from

---

[1] On September 30, 2009, the Court granted two petitions for a writ of certiorari. In No. 08-1498, the governmental parties are the petitioners, and the private parties (who were plaintiffs in the district court) are the respondents. In No. 09-89, the same private parties are the conditional cross-petitioners, and the governmental parties are the respondents. On November 2, 2009, the Court granted the parties' joint motion to amend the briefing schedule, which provided that the private parties would proceed as the petitioners and the governmental parties would proceed as the respondents in both cases.

8

affiliating with or advocating on behalf of the PKK or LTTE." *Id.* at 1191-1192.

The district court also rejected petitioners' argument that the statute violates their First Amendment speech rights. The court began by stating that it would apply intermediate scrutiny to the material-support statute because its "restrictions are content-neutral and are directed at the noncommunicative elements of [petitioners'] actions." *Humanitarian Law Project*, 9 F. Supp. 2d at 1192. The statute survives that scrutiny, the court concluded, because it is within the constitutional power of the federal government to enact; it furthers an important and substantial government interest (protecting national security); it is "not directed at suppressing [petitioners'] political speech or advocacy of the PKK's and LTTE's political agenda," but instead is "aimed at precluding material support to terrorist organizations that divert funds raised for political and humanitarian resources to their terrorist activities"; and it "restricts [petitioners'] First Amendment freedoms no more than is essential." *Id.* at 1192-1195.

The district court, however, agreed with petitioners that the terms "training" and "personnel," as they were then defined in the statute, were unconstitutionally vague. *Humanitarian Law Project*, 9 F. Supp. 2d at 1203. On the basis of that holding, the court entered a preliminary injunction prohibiting the government from enforcing the terms "training" or "personnel" against petitioners or their members. *Id.* at 1204-1205; *Humanitarian Law Project* v. *Reno*, 9 F. Supp. 2d 1205, 1215 (C.D. Cal. 1998). The court of appeals affirmed the preliminary injunction on the same ground. *Humanitarian Law Project* v. *Reno*, 205 F.3d 1130, 1137-1138 (9th Cir. 2000). This Court denied interlocutory review of peti-

9

tioners' First Amendment claims. *Humanitarian Law Project* v. *Ashcroft*, 532 U.S. 904 (2001).

On remand, after both parties filed dispositive motions, the district court permanently enjoined enforcement of the terms "training" and "personnel" against petitioners, again on vagueness grounds. No. CV-98-1971 ABC, 2001 WL 36105333. A panel of the court of appeals affirmed that judgment as well. 352 F.3d 382. After the IRTPA amendments became law, however, the court granted the government's petition for rehearing en banc, vacated the panel's judgment insofar as it had found the terms "training" and "personnel" unconstitutionally vague, and remanded to the district court to consider the case in light of those amendments. 393 F.3d 902. The en banc court affirmed the district court's final judgment insofar as it had rejected petitioners' other First Amendment challenges. *Ibid.*; see 352 F.3d at 393.

b. In the second action, petitioners focused on the term "expert advice or assistance," asserting that it too violates their associational rights and is overbroad and vague. The district court rejected petitioners' attempt to relitigate their associational claim. *Humanitarian Law Project* v. *Ashcroft*, 309 F. Supp. 2d 1185, 1203 (C.D. Cal. 2004). The court also rejected their argument that the term "expert advice or assistance" is overbroad, explaining that the statute "is aimed at furthering a legitimate state interest" and that petitioners had "failed to demonstrate" that its "application to protected speech is 'substantial' both in an absolute sense and relative to the scope of the law's plainly legitimate applications." *Id.* at 1202-1203. But the court agreed with petitioners that the term is vague. *Id.* at 1198-1201. It therefore enjoined the government from enforcing the challenged

10

provision against petitioners for any assistance to the PKK and the LTTE. *Id.* at 1204. The court of appeals subsequently vacated and remanded that judgment for consideration of the IRTPA amendments. *Humanitarian Law Project* v. *Gonzales*, No. 04-55871 (9th Cir. Apr. 1, 2005).

c. Both remanded cases were consolidated before the district court, where petitioners asserted that the terms "training," "expert advice or assistance," and "personnel" are unconstitutionally vague, even as amended and clarified by IRTPA. Petitioners also argued that the term "service"—which IRTPA had added to the definition of "material support or resources"—is impermissibly vague. The district court agreed with those claims, except as to "personnel" and "expert advice or assistance" in the form of "scientific [or] technical . . . knowledge." Pet. App. 62a-69a & n.23. The court again enjoined the government from enforcing the challenged provisions against petitioners for support given to the PKK and the LTTE. *Id.* at 75a.

4. The court of appeals affirmed. Pet. App. 1a-32a.

As a threshold matter, the court of appeals agreed that "there is no Fifth Amendment due process violation." Pet. App. 19a. The court explained that in enacting IRTPA, "Congress could have, but chose not to, impose a requirement that the defendant act with the specific intent to further the terrorist activity of [a designated] organization." *Id.* at 18a. Rather, Congress required only "knowledge that the donee organization is a designated foreign terrorist organization" or "knowledge that the organization is or has engaged in terrorist activities or terrorism." *Id.* at 15a-16a (citing 18 U.S.C. 2339B(a); emphasis omitted). The court concluded that "acting with 'knowledge' satisfies the requirement of

11

'personal guilt' and eliminates any due process concerns." *Id.* at 17a.

Turning to petitioners' vagueness challenge, the court of appeals held that the term "training" is unconstitutionally vague. Pet. App. 20a-23a. The court considered it "highly unlikely that a person of ordinary intelligence would know whether, when teaching someone to petition international bodies for [humanitarian] aid, one is imparting a 'specific skill' or 'general knowledge.'" *Id.* at 21a-22a. In addition, "[e]ven if persons of ordinary intelligence could discern between the instruction that imparts a 'specific skill,' as opposed to one that imparts 'general knowledge,'" the court stated that "the term 'training' could still be read to encompass speech and advocacy protected by the First Amendment." *Id.* at 22a. The court concluded that the term "training" is vague "because it 'implicates, and potentially chills, [petitioners'] protected expressive activities.'" *Id.* at 22a-23a (quoting *id.* at 64a).

The court of appeals also held that the term "expert advice or assistance" is unconstitutionally vague. Pet. App. 23a-24a. The court noted that the statute's definition of "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge," 18 U.S.C. 2339A(b)(3), was borrowed from Federal Rule of Evidence 702. But that borrowing, the court stated, "does not clarify the term 'expert advice or assistance' for the average person with no background in law." Pet. App. 24a (quoting *id.* at 66a). In particular, the court concluded that "the 'other specialized knowledge' portion of the ban" would "cover constitutionally protected advocacy." *Ibid.* By contrast, the court held that the provision was not vague insofar as it reached "scientific [or] technical * * * knowl-

12

edge," because "the meaning of 'technical' and 'scientific' is reasonably understandable to a person of ordinary intelligence." *Ibid.* (quoting *id.* at 66a).

Similarly, the court of appeals held that the term "service" is unconstitutionally vague. Pet. App. 25a. According to the court, "each of the other challenged provisions could be construed as a provision of 'service.'" *Ibid.* For instance, the court stated, "[t]he term 'service' presumably includes providing members of PKK and LTTE with 'expert advice or assistance' on how to lobby or petition representative bodies such as the United Nations" and includes "'training' members of PKK or LTTE on how to use humanitarian and international law to peacefully resolve ongoing disputes." *Ibid.* The court also concluded that "it is easy to imagine protected expression that falls within the bounds" of that term. *Ibid.* (quoting *id.* at 67a).

The court of appeals held, however, that the term "personnel" is not vague. Pet. App. 26a-27a. The court noted that, as a result of IRTPA, the statute "criminalizes providing 'personnel' to a foreign terrorist organization only where a person, alone or with others, '[work]s under that terrorist organization's direction or control or . . . organize[s], manage[s], supervise[s], or otherwise direct[s] the operation of that organization.'" *Id.* at 26a (brackets in original) (quoting 18 U.S.C. 2339B(h)). As amended, the court held, the term is not vague because it "no longer criminalizes pure speech protected by the First Amendment." *Id.* at 26a-27a.

Finally, the court of appeals rejected petitioners' claim that the material-support statute is overbroad. Pet. App. 27a-29a. The court noted that because the statute is "aimed * * * at stopping aid to terrorist groups," and "is not aimed primarily at speech, an

13

overbreadth challenge is more difficult to show." *Id.* at 28a. Moreover, the court found that the statute's "ban on provision of 'material support or resources' to designated foreign terrorist organizations undoubtably has many legitimate applications," such as criminalizing the provision of "income, weapons, or expertise in constructing explosive devices." *Ibid.* "[A]lthough [petitioners] may be able to identify particular instances of protected speech that may fall within the statute," the court concluded, "those instances are not substantial when compared to the legitimate applications of [S]ection 2339B(a)." *Id.* at 29a.

## SUMMARY OF ARGUMENT

I. A. The material-support statute is not void for vagueness under the Fifth Amendment. As a threshold matter, the statute requires that a person "knowingly provide[] material support or resources to a foreign terrorist organization." 18 U.S.C. 2339B(a)(1). A defendant therefore must know that the recipient of his proffered aid has been designated as a terrorist organization or engages in terrorist activity. That express scienter requirement diminishes any vagueness concerns. Moreover, a defendant must direct his aid to a foreign terrorist organization. The statute does not prohibit independent advocacy or expression of any kind. What it prohibits is the separate act of rendering assistance to foreign terrorists, whether that assistance takes the form of money or other property or a "service" such as "training," "expert advice or assistance," or "personnel." 18 U.S.C. 2339A(b)(1).

The challenged terms rest on simple distinctions that are readily understood by persons of ordinary intelligence. The term "training" is defined as imparting a

14

specific skill rather than general knowledge, and the term "expert advice or assistance" is similarly defined as imparting scientific, technical, or specialized knowledge. Ordinary individuals understand the difference between what is commonly known and what is not. The term "personnel" is defined as persons who either supervise or work under the direction or control of a foreign terrorist organization, and the term "service" refers to action taken for the direct benefit of a foreign terrorist organization. Again, ordinary citizens understand the difference inherent in these definitions between concerted and independent action.

The statute is not vague simply because application of these terms to particular actions may sometimes be difficult. Vagueness lies not in occasional uncertainty about whether an incriminating fact has been proved, but in fundamental indeterminacy about what that fact is. See *United States* v. *Williams*, 128 S. Ct. 1830, 1846 (2008). For that reason, courts have routinely upheld the challenged terms, which appear in thousands of statutes throughout the United States Code, as sufficiently clear to provide fair notice of what conduct the law prohibits. Moreover, petitioners challenge the statute only as applied to their own conduct, all of which falls squarely within any interpretation of the terms "training," "expert advice or assistance," "personnel," or "service." Application of the statute to petitioners' proposed activities thus presents no constitutional difficulties. Indeed, petitioners have consistently used those very terms to describe their proposed activities.

B.    The court of appeals enjoined enforcement of the terms "training," "expert advice or assistance," and "service" because, in its view, those terms could be read to encompass independent advocacy. But the material-

15

support statute is not reasonably read to cover—and in the face of any constitutional doubt should not be read to cover—independent advocacy. In any event, suppressing such advocacy would make the statute unconstitutional as applied, not vague. The court of appeals erred by conflating petitioners' overbreadth claim under the First Amendment with their vagueness claim under the Fifth Amendment.

II. The material-support statute does not violate the First Amendment. Contrary to petitioners' claims, the statute is a regulation of conduct, only incidentally affecting speech and applying irrespective of any expressive content; it is therefore subject to intermediate scrutiny under *United States* v. *O'Brien*, 391 U.S. 367 (1968). The statute easily survives such scrutiny because it is narrowly tailored to advance important governmental interests unrelated to the suppression of petitioners' expression. Nor is the statute substantially overbroad: the vast bulk of the statute's applications, involving such matters as the provision of money and weapons to terrorist organizations, are not even arguably problematic. Finally, the statute does not infringe associational rights, because it does not prevent petitioners from joining or otherwise associating with foreign terrorist organizations. For those reasons, the lower courts, including the courts below, have uniformly upheld the statute against First Amendment challenge.

III. Petitioners argue that, as a matter of constitutional avoidance, the material-support statute should be interpreted to require specific intent to further a terrorist organization's unlawful activities. That argument is waived, futile, and incorrect. Petitioners raise their current avoidance argument for the first time before this Court; construing the statute to require specific intent

16

would not avoid resolution of petitioners' constitutional claims; and Congress expressly rejected such a specific-intent requirement.

## ARGUMENT

Petitioners raise a host of challenges to the material-support statute. They contend that the statute is unconstitutional under the Fifth Amendment because it is overly vague (Br. 25-42) and under the First Amendment because it impermissibly discriminates on the basis of content (Br. 43-55), because it is overbroad (Br. 42-43), and because it violates their right to associate with designated terrorist organizations (Br. 56-59). The court of appeals correctly rejected petitioners' arguments regarding content-based discrimination, overbreadth, and associational rights, but erred in partially accepting petitioners' due process challenge. The material-support statute provides persons of ordinary intelligence with reasonably clear, and therefore constitutionally sufficient, notice of the types of direct aid that it prohibits. The court of appeals thus erred by partially invalidating one of this nation's most valuable and vital tools in the fight against international terrorism.

## I. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID TO KNOWN TERRORIST ORGANIZATIONS DO NOT VIOLATE THE FIFTH AMENDMENT

### A. The Statute's Terms Are Sufficiently Clear To Provide Notice To Persons Of Ordinary Intelligence

The Fifth Amendment's Due Process Clause requires that a criminal statute be sufficiently clear to give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). The Clause does not require

17

that an offense be defined with "mathematical certainty," *id.* at 110, but only that it give "relatively clear guidelines as to prohibited conduct," *Posters 'N' Things, Ltd.* v. *United States*, 511 U.S. 513, 525 (1994). The statutory definition of "material support" in 18 U.S.C. 2339A(b)(1) readily satisfies that standard.

As a threshold matter, this Court should apply the vagueness standard that it typically uses in cases involving the application of statutes defining criminal offenses. Petitioners at times appear to argue otherwise, contending that the material-support statute is "subject to the most stringent vagueness scrutiny" in part because it "trench[es] on speech and associational rights." Br. 25-26. But this Court has never suggested that a statute aimed at regulating conduct regardless of its expressive content—*i.e.*, the provision of aid to terrorist organizations—triggers a heightened need for legislative precision, just because it incidentally captures some expressive activity. As discussed further in Part II.A, the material-support statute is not targeted at speech, still less at any particular message, and petitioners may accordingly express any views they wish about the PKK, LTTE, or any other terrorist organization. The statute simply prevents petitioners from contributing resources of various kinds that further those groups' activities. Such a prohibition is not subject to any special vagueness standard.

Petitioners' request for heightened scrutiny is particularly inappropriate in this context, because Congress crafted the statute to minimize even incidental interference with First Amendment freedoms. For example, Congress included a scienter requirement, which serves to "mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his con-

18

duct is proscribed." *Village of Hoffman Estates* v. *Flip-side, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); see *id.* at 499 n.14 (citing cases). As the court of appeals explained, the statute at issue requires "that the donor defendant provided 'material support or resources' * * * with *knowledge* that the donee organization is a designated foreign terrorist organization, or with *knowledge* that the organization is or has engaged in terrorist activities or terrorism." Pet. App. 15a-16a. That scienter requirement helps to remove any potential vagueness problem by preventing application of the statute to innocent conduct, including any with an expressive component.

In any event, the material-support statute meets even the vagueness standard that the Court has employed in cases involving speech restrictions. This Court has repeatedly observed that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 794 (1989); see *Williams*, 128 S. Ct. at 1845; *Hill* v. *Colorado*, 530 U.S. 703, 740 (2000) (Souter, J., concurring). Petitioners here identify four components of the definition of material support that they consider impermissibly vague: "training," "expert advice or assistance," "personnel," and "service." In fact, each of those terms is sufficiently clear to give persons of ordinary intelligence fair notice of what the statute prohibits.

Still more importantly, there is no difficulty in applying the material-support statute to the facts of this case. Petitioners here do not challenge the statute on its face. Rather, they claim that, "as applied to their proposed speech, the challenged provisions are intolerably vague." Br. 4; *id.* at 25 ("The provisions are vague as applied to

19

plaintiffs' intended speech.") (emphasis omitted). Accordingly, the court of appeals addressed only an as-applied vagueness challenge, see Pet. App. 22a n.6, and that is the only challenge before this Court. Petitioners' claim thus depends on whether ordinary persons would understand how the statute applies not to petitioners' fanciful hypotheticals, but to their own proposed conduct. See *Village of Hoffman Estates*, 455 U.S. at 495 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *Parker* v. *Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). And in fact all of petitioners' proposed activities fall squarely within the ordinary meaning of the statute's terms. The clarity of the statute as applied in this case is fatal to petitioners' claim of vagueness.

### 1. *Instructing the PKK and LTTE on how to engage in international political advocacy constitutes "training"*

a. Even before Congress clarified the definition of "training" by enacting IRTPA in 2004, the meaning of that term was clear and readily intelligible to the average person. "Train" is defined as "to teach or exercise (someone) in an art, profession, trade, or occupation," to "direct in attaining a skill," or to "give instruction to." *Webster's Third New International Dictionary of the English Language* 2424 (1993) (*Webster's*); see *The American Heritage Dictionary of the English Language* 1830 (4th ed. 2006) (*American Heritage*) (defining "train" as "[t]o make proficient with specialized instruction and practice"); *Merriam-Webster's Collegiate Dictionary* 1326 (11th ed. 2005) (*Merriam-Webster's*) (de-

20

fining "train" as "to form by instruction, discipline, or drill" or "to teach so as to make fit, qualified, or proficient"); *The Random House Dictionary of the English Language* 2007 (2d ed. 1987) (*Random House*) (defining "train" as "to make proficient by instruction and practice, as in some art, profession, or work").

As courts have recognized, an ordinary person would readily understand those concepts. See *California Teachers Ass'n* v. *State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (holding that "instruction" is a "word[] of common understanding" and is not unconstitutionally vague). Indeed, a host of federal statutes use the term "training" in a similar manner to Section 2339A(b)(1).[2] Despite the thousands of references to the term "training" in the United States Code, petitioners

---

[2] See 8 U.S.C. 1182(a)(3)(B)(iv)(VI) (prohibiting aliens from providing material support, including "training," to terrorists); 22 U.S.C. 7423(e) and 7432(12) (prohibiting any federal, state, or local governmental agency or entity from providing support, including "the training or detail of personnel," to the International Criminal Court); see also 5 U.S.C. 4103(a) (requiring federal agencies to establish plans "for the training of employees"); 15 U.S.C. 3116 (requiring the Secretary of Labor to "assure the availability of counseling, training, and other support activities" for the unemployed); 20 U.S.C. 954a(b) (authorizing the National Endowment for the Arts in various ways "to support the education, training, and development of this Nation's artists"); 22 U.S.C. 2770a(a) (providing that "the President may provide training and related support to military and civilian defense personnel of a friendly foreign country or an international organization"); 42 U.S.C. 9840a (providing for "ongoing training and technical assistance" to Early Head Start agencies); 42 U.S.C. 15025 (providing that federal assistance to designated state agencies "may support and conduct training for persons who are individuals with developmental disabilities"). The term "training" even appears in the United States Constitution, which reserves to the States "the Authority of training the Militia according to the discipline prescribed by Congress." Art. I, § 8, Cl. 16.

21

do not point to any authority for the proposition that terms like "training," "instruction," or "teaching" are impermissibly vague.

In fact, petitioners' own statements belie their argument. The term "training" is sufficiently intelligible that petitioners repeatedly use it to describe their proposed activities. See Br. 10 ("Prior to AEDPA's enactment, the HLP and Judge Fertig had been assisting the PKK by training them in how to bring human rights complaints to the United Nations."); J.A. 81 (original complaint; alleging that HLP and Judge Fertig "would like to * * * provide the PKK and the Kurds with training * * * on how to engage in political advocacy on their own behalf and on how to use international law to seek redress for human rights violations"); J.A. 58-59 (amended complaint; same). As petitioners' statements demonstrate, average persons understand that instructing groups like PKK and the LTTE on "how to engage in political advocacy" and "how to use international law to seek redress for human rights violations" falls within the commonly accepted meaning of the term "training."

b. Even if the term "training" were not sufficiently intelligible standing alone, Congress further defined that term in IRTPA to include "instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. 2339A(b)(2). Contrary to the court of appeals' conclusion, Pet. App. 21a-22a, that definition is clear on its face: a person of ordinary intelligence is capable of distinguishing between what is commonly or generally known and what is not. See *Pierce* v. *Underwood*, 487 U.S. 552, 572 (1988) (distinguishing

22

"some distinctive knowledge or specialized [litigation] skill" from "general lawyerly knowledge").[3]

Moreover, the material-support statute only prohibits imparting a specific skill "*to* a foreign terrorist organization." 18 U.S.C. 2339B(a)(1) (emphasis added). The statute thus prohibits support that is channeled to a foreign terrorist organization, and excludes all advocacy or expression that occurs independently of such an organization. See *Webster's* 2401 (defining "to" as "a function word to indicate movement * * * toward * * * a place, person, or thing that is reached"). Indeed, that limitation is inherent in the notion of "training" itself. See *id.* at 2424 (defining "train" as "to teach or exercise *(someone)* in an art, profession, trade, or occupation") (emphasis added). Petitioners themselves recognize that limitation. See Br. 46 ("Here, the statute flatly bans certain kinds of speech *to* designated organizations, *e.g.*, training of or advising their members."). Accordingly, a defendant provides "training" within the meaning of the material-support statute only if he endeavors to impart a specific skill to people whom he knows to be members of a foreign terrorist organization.[4]

---

[3] The Sentencing Guidelines make a similar distinction between specialized and general skills. All criminal defendants, not simply those convicted pursuant to the material-support statute, are subject to a two-level increase in their offense level if they "use[ ] a special skill, in a manner that significantly facilitate[s] the commission or concealment of the offense." Sentencing Guidelines § 3B1.3. A "special skill" is defined, in turn, as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.* § 3B1.3, comment. (n.4).

[4] Petitioners quote (Br. 28) portions of a colloquy with the government's counsel before the district court. In context, the government explained, as it has throughout this litigation, that the material-support

23

Petitioners argue that the distinction between general knowledge and specific skills is "inescapabl[y] vague[]." Br. 27. The sole legal support that petitioners advance for that proposition is *Gentile* v. *State Bar*, 501 U.S. 1030 (1991), in which this Court found impermissibly vague a state ethical rule limiting an attorney, in his communications to the public, to stating "without elaboration . . . the general nature of the . . . defense," *id.* at 1048. Petitioners' argument would suggest that any federal statute distinguishing between the general and the specific is subject to a possible vagueness challenge. See, *e.g.*, 12 U.S.C. 1828(*l*) (referring to "general or specific regulation"); 22 U.S.C. 7611(b)(3)(A) (same; "general and specific" objectives); 25 U.S.C. 2218(g) (same; "any general or specific statute"); 47 U.S.C. 504(a) (same; "other general or specific penalties"). But that proposition cannot be correct, and indeed *Gentile* is different from this case in two critical respects.

First, *Gentile* arose from regulation of "classic political speech," at "the very center of the First Amendment." 501 U.S. at 1034. By contrast, this case involves a generally applicable, content-neutral regulation of conduct. See pp. 44-48, *infra.* Second, and even more important, the state ethics rule in *Gentile* employed terms (*e.g.*, "general nature" and "elaboration") with "no settled usage or tradition of interpretation" in the particular context. 501 U.S. at 1048-1049. The rule thus required "wholly subjective judgments" about when at-

---

statute requires action taken "at the behest [of]" or "at the direction and control" of a terrorist organization. C.A. Supp. E.R. 217; *id.* at 221 ("Training is a matter of are you providing it to a foreign terrorist organization or not."); *id.* at 224-225. The statute prohibits only activity taken in concert with a terrorist organization.

24

torneys had said too much—judgments that could not be guided by "statutory definitions, narrowing context, or settled legal meanings." *Williams*, 128 S. Ct. at 1846.

By contrast, in this context the distinction between "a specific skill" and "general knowledge" has a settled usage, see *Pierce*, 487 U.S. at 572, as well as a legal analogue in the sentencing context, see p. 22 n.3, *supra*. The statute uses a "term[] of degree," *Gentile*, 501 U.S. at 1049, but in a way and in a context that supplies guidance in determining what that term means. Cf. *James* v. *United States*, 550 U.S. 192, 210 n.6 (2007) (holding that the term "serious potential risk" is not impermissibly vague); *Board of Governors of the Fed. Reserve Sys.* v. *Agnew*, 329 U.S. 441, 449 (1947) (same; "substantiality"). Moreover, the ethics rule in *Gentile* lacked any scienter requirement, and therefore failed to screen out defendants who could not discern the lawfulness of their statements even after "a conscious effort at compliance." 501 U.S. at 1051. Here, there is little danger that a defendant will inadvertently train foreign terrorists in specific skills.[5]

---

[5] Petitioners posit (Br. 27-28) a hypothetical course in geoscience or geopolitics offered to members of the PKK or LTTE. The hypothetical is drawn from a colloquy with the government's counsel at oral argument before the en banc court of appeals. Counsel correctly explained that, as amended, the material-support statute prohibits instructing members of terrorist organizations in specific scientific or political skills. See United States Court of Appeals for the Ninth Circuit, *Media for Case: Humanitarian Law Pro v. Gonzales, No. 02-55082* (Dec. 14, 2004) <http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id= 0000004506> (50:40-51:20). Geoscience and geopolitics are types of specialized knowledge not held by members of the general public, and instruction in them requires substantial education or training. As counsel further explained, the ability to hypothesize cases that test the boun-

25

Of course, there may be hard cases in which people can reasonably debate whether a particular type of instruction imparts a specific skill, but that occasional difficulty does not render the statute vague. This Court has repeatedly observed that "[c]lose cases can be imagined under virtually any statute," and "the mere fact that close cases can be envisioned" does not indicate that a statute is unconstitutionally vague. *Williams*, 128 S. Ct. at 1846; *Hill*, 530 U.S. at 733 ("[T]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question.") (quoting *American Commc'ns Ass'n* v. *Douds*, 339 U.S. 382, 412 (1950)). Determining whether a defendant's instruction imparted a specific skill is no more difficult, as a factual matter, than determining whether a defendant believed or intended others to believe that material was child pornography, *Williams*, 128 S. Ct. at 1846, or determining whether a defendant made a noise or diversion that tended to disturb the peace or good order of a school, *Grayned*, 408 U.S. at 110-111. The point for vagueness purposes is that an ordinary person would understand what it means to instruct terrorist organizations in a specific skill.

c. Still more critically, an ordinary person would understand how this provision of the material-support statute applies to the particular facts of this case. Petitioners seek to "provide the PKK and the Kurds with training and written publications on how to engage in political advocacy on their own behalf and on how to use international law to seek redress for human rights violations." J.A. 59. Teaching the PKK and LTTE "how to

---

dary between general and specialized knowledge does not render the statute vague. *Ibid.* (51:50-52:22, 54:23-54:44).

26

petition for relief before representative bodies like the United Nations," Pet. App. 35a, is designed to impart a specific skill: a person of ordinary intelligence would understand that the skill of international political advocacy requires more than general knowledge. As evidence of that common understanding, at oral argument before the en banc court of appeals, petitioners' counsel twice referred to the "human rights advocacy training" that petitioners hope to provide, see United States Court of Appeals for the Ninth Circuit, *Media for Case: Humanitarian Law Pro v. Gonzales, No. 02-55082* (Dec. 14, 2004) <http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000004506> (*Media for Case*) (8:45, 9:57), making clear that such instruction concerns a specialized subject matter and skill set.

Indeed, at every opportunity throughout this litigation, petitioners have represented that they want to instruct the PKK and LTTE not on abstract or academic subjects but on a specific skill: how to petition international bodies like the United Nations more effectively. Petitioners may not believe such activity to be harmful, but they must understand, as all reasonable observers would, that the activity is covered by the statute's terms. Petitioners' proposed activity falls within the category of aid to terrorist organizations that Congress sought to prohibit. Because the material-support statute is clear as applied to petitioners' intended activities, the Court need not consider whether the statute might be vague as applied to others' hypothetical activities. See *Village of Hoffman Estates*, 455 U.S. at 495; *Levy*, 417 U.S. at 756. The clarity of the statute as applied to petitioners' own conduct is fatal to their claim of vagueness.

27

### 2. *Consulting with the PKK and LTTE on international law, medical care, and economic development constitutes "expert advice or assistance"*

a. Petitioners also contend (Br. 29-33) that the phrase "expert advice or assistance" is unconstitutionally vague. They do not dispute that they want to provide "advice or assistance" to the PKK and LTTE. Rather, they claim that they are "force[d] * * * to guess whether any aspect of their advice" is expert in nature. Br. 29. But the term "expert" has a clearly understood meaning to the average person, referring to special skills or knowledge. See *Webster's* 800 (defining "expert" as "having special skill or knowledge derived from training or experience"); *Merriam-Webster's* 440 (same); see also *American Heritage* 625 (defining "expert" as "[h]aving, involving, or demonstrating great skill, dexterity, or knowledge as the result of experience or training"); *Random House* 681 (defining "expert" as "possessing special skill or knowledge; trained by practice; skillful or skilled").

For that reason, courts have never had any difficulty in determining the ordinary meaning of the term "expert." See, *e.g.*, *United States* v. *Moses*, 137 F.3d 894, 899 (6th Cir. 1998) (construing the term "expert testimony" in 18 U.S.C. 3509(b)(1)(B)(ii) to mean testimony by a "person with a high degree of skill or knowledge of a certain subject") (quoting *The American Heritage Dictionary of the English Language* 645 (3d ed. 1992)); *United States* v. *Alves*, 317 F. Supp. 2d 65, 68 (D. Mass. 2004) (construing the term "expert or other services" to include "[t]he services of an immigration counsel"). Like the term "training," the term "expert" appears through-

28

out the United States Code, and petitioners do not point to any authority finding the term vague in any context.[6]

Notably, petitioners again do not seem to believe their own argument. The term "expert" is sufficiently intelligible that petitioners consistently have used it to describe their past and proposed future activities. J.A. 56 ("Since 1991, the HLP and Judge Fertig have devoted a substantial amount of time and resources * * * to working with and providing training, expert advice and other forms of support to the PKK in its efforts to protect the Kurds from human rights abuses."); J.A. 60 ("The Sangam and its members wish to offer their expert medical advice and assistance * * * by consulting with the LTTE on how the health care system in Tamil Eelam can be improved."); J.A. 61 ("The WTCC and its members wish to provide expert advice and assistance to the LTTE."); J.A. 62 ("Many members of FETNA wish to provide their expert advice and assistance to the Tamils."); *ibid.* ("The THWRC and its members wish to provide expert advice and assistance to the LTTE.").

---

[6] See, *e.g.*, 5 U.S.C. 3323(d) (authorizing the Chief of Engineers of the Army to employ retired employees "whose expert assistance is needed in connection with river and harbor or flood control works"); 5 U.S.C. App. 2(a) at 455 (finding that federal advisory committees furnish "useful and beneficial * * * expert advice" to the federal government); 6 U.S.C. 236(e)(2)(A) (requiring that certain employees of the Department of Homeland Security provide types of "expert advice and training to consular officers"); 10 U.S.C. 373(2) (authorizing the Secretary of Defense to provide federal, state and local law enforcement officials with certain kinds of "expert advice"); 42 U.S.C. 6864a(b)(3) (authorizing the Secretary of Energy to provide financial assistance for "expert advice" related to energy efficiency improvements in low-income housing).

29

b. The clarity of "expert advice or assistance" has only been enhanced by IRTPA, which further defines it to mean "advice or assistance derived from scientific, technical or other specialized knowledge." 18 U.S.C. 2339A(b)(3). That definition is taken from Federal Rule of Evidence 702, which permits expert witnesses to offer testimony based on "scientific, technical, or other specialized knowledge." This Court explained in *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999), that the category of scientific, technical, and other specialized knowledge consists of "specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case"—all of which often rest on experiences "foreign in kind" to those of the population in general. *Id.* at 149 (citation omitted). Once again, an ordinary person can readily distinguish between common knowledge and specialized knowledge foreign to the experiences of most people.

The court of appeals believed that the origins of the phrase "expert advice or assistance" in Rule 702 did not clarify the statute "for the average person with no background in law." Pet. App. 24a (quoting *id.* at 66a). Similarly, petitioners argue that Rule 702 is designed for use by "trained judges," not the "general public." Br. 33. But this Court's interpretation of Rule 702 has been based on the ordinary meaning of the rule's words, not on obscure legal arcana. See *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-590 (1993) (citing dictionary definition of "knowledge"). The average person need not know anything about Rule 702 or about the relationship between Rule 702 and the phrase "expert

30

advice or assistance" in order to understand the meaning of that term.[7]

The court's analysis is particularly puzzling because it held that part of the phrase—namely, "scientific [or] technical * * * knowledge"—is *not* vague, while the immediately following phrase "other specialized knowledge" is vague. Pet. App. 24a. But under the principle of *ejusdem generis*, "other specialized knowledge" takes its meaning from the preceding (concededly non-vague) terms "scientific" and "technical." See *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 114-115 (2001). Indeed, "the average person with no background in law," Pet. App. 24a (quoting *id.* at 66a), would not need to be familiar with "such Latin phrases as *ejusdem generis* and *noscitur a sociis* to reach [the] obvious conclusion" that "words grouped in a list should be given related meaning," *Third Nat'l Bank* v. *Impac Ltd.*, 432 U.S. 312, 322-323 & n.16 (1977) (citation omitted). An ordinary person would understand that the entire phrase —"scientific, technical or other specialized knowledge"—refers to knowledge relating to subject matter and based on experiences not usually possessed or shared by the general public.

c.  Petitioners claim (Br. 29) that they cannot know whether "advice or assistance" is "derived from scien-

---

[7] In any event, the court of appeals' criticism rests on a misunderstanding of the vagueness standard. Many terms used in criminal statutes, such as "malice aforethought" or "conspiracy," are not fully intelligible as a matter of ordinary English but are nevertheless enforceable because they have determinate meanings in the law. See *Morissette* v. *United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art" with an established legal meaning, "it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.").

31

tific, technical or other specialized knowledge," 18 U.S.C. 2339A(b)(3), because "all knowledge might be thought" to do so, Br. 29. But that is an absurd reading of the statute: if Congress had intended to refer to the entirety of human knowledge, it would not have added the words "scientific, technical or other specialized knowledge." For the same reason that Congress expressly excluded general knowledge from the definition of "training," Congress required "expert advice or assistance" to be based on or drawn from a body of scientific, technical or specialized knowledge—as when, for example, a banker provides advice on laundering money or a chemist provides advice on manufacturing biological weapons. Just as an ordinary person would understand the difference between specific skills and general knowledge, see pp. 21-22, *supra*, so too he would appreciate when advice is derived from specialized rather than general knowledge.

Petitioners fall back (Br. 30) on the claim that even the terms "scientific" and "technical" are vague. But nothing in this Court's precedents supports a vagueness challenge to words of this kind, whose core meanings are objective and readily understood. This Court has found vagueness in words like "annoy[ing]," *Coates* v. *City of Cincinnati*, 402 U.S. 611, 614 (1971), or "[i]ndecent," *Reno* v. *ACLU*, 521 U.S. 844, 870-871 & n.35 (1997), because they require "wholly subjective judgments," *Williams*, 128 S. Ct. at 1846. By contrast, the use of terms like "scientific" and "technical" rests on factual determinations—*i.e.*, whether knowledge is specific, practical, and related to a particular branch of science or a profession. See *Webster's* 2348 (defining "technical" as "having special usu[ally] practical knowledge esp[ecially] of a mechanical or scientific subject"). Petitioners focus

32

(Br. 32) on less common, alternative definitions of the words, without explaining why Congress would have resorted to those less familiar meanings.

To be sure, "it may be difficult in some cases to determine" whether knowledge is scientific or technical, *Williams*, 128 S. Ct. at 1846, but "courts and juries every day pass upon" precisely that type of factual question, *ibid.* (quoting *Douds*, 339 U.S. at 411). Once again, the ability to devise close hypothetical cases does not render Section 2339A(b)(3)'s requirement indeterminate. Moreover, terms like "scientific" and "technical" have a settled legal meaning, see *Kumho Tire Co.*, 526 U.S. at 148-149, and Congress used them in a context that provides further indication of their scope. The definition of "material support and resources" includes "false documentation or identification, communications equipment, * * * weapons, lethal substances, [and] explosives." 18 U.S.C. 2339A(b)(1). That list demonstrates the types of "scientific" and "technical" "advice or assistance" that concerned Congress.

Petitioners argue (Br. 30) that general knowledge may once have been scientific, technical, or specialized knowledge that has since been dispersed to the public. But a term is not vague just because its coverage may change over time. No doubt the Copernican theory once rested with a handful of astronomers, whereas now is a matter of common knowledge. But that progression does not render Section 2339B(a)(1) vague, because it requires that the expert advice or assistance be derived from specialized knowledge at the time a person "knowingly provides [it] to a foreign terrorist organization." What matters is that divulging that the planets orbit the sun does not *now* count as "expert advice." Petitioners similarly argue (Br. 31) that whether knowledge is spe-

33

cialized depends on the level of sophistication of the recipient. But the proper test looks to the general public, not the particular recipient of the advice or assistance. Advice on encrypting communications becomes no more general because the recipients are experienced software programmers. In the analogous context of interpreting "specialized knowledge" under Rule 702, this Court has looked to whether the knowledge is foreign to the experiences of jurors, *Kumho Tire Co.*, 526 U.S. at 149, who are themselves "drawn from a fair cross section of the community," *Taylor* v. *Louisiana*, 419 U.S. 522, 527 (1975).

d. And again, critically, the term "expert advice or assistance" is not vague as applied in this case, even if it conceivably could be vague as applied in some other. Petitioners seek to advise the PKK and LTTE on "how to bring human rights complaints to the United Nations." Br. 10; see J.A. 59 (alleging that petitioners want to advise "on how to engage in political advocacy on their own behalf and on how to use international law to seek redress for human rights violations"). Petitioners also seek to "assist[]" the PKK and LTTE "in peace negotiations." Br. 10; see J.A. 59 (alleging that petitioners want to "assist PKK members at peace conferences and other meetings designed to support a peaceful resolution of the Turkish conflict"). Petitioners further seek to provide "expert medical advice and assistance," J.A. 60; "expert advice on how to improve the delivery of health care, with a special focus on the area of otolaryngology," J.A. 61; and "expert advice and assistance" "in the fields of politics, law, and economic development," *ibid.*, and "information technology," J.A. 62.

Advice in each of those subject matters requires specialized, practical knowledge that is the result of sub-

34

stantial education or training. A person of ordinary intelligence would understand that all of these forms of assistance require more than general knowledge. Whatever difficulties might exist at the margins of "expert advice and assistance," petitioners' proposed activities fall squarely within its core. Because the term "expert advice and assistance" clearly covers petitioners' proposed activities, their as-applied vagueness challenge must fail. *Village of Hoffman Estates*, 455 U.S. at 495; *Levy*, 417 U.S. at 756.

### 3. *Providing persons to work under the direction or control of the PKK and LTTE constitutes "personnel"*

a.  Petitioners argue (Br. 36-38) that the term "personnel" is unconstitutionally vague. The court of appeals correctly rejected that argument. See Pet. App. 26a-27a. The meaning of the term "personnel" was clear to a person of ordinary intelligence even before IRTPA. See *Webster's* 1687 (defining "personnel" as "persons of a particular (as professional or occupational) group"). IRTPA further clarified the material-support statute, so that it now provides:

> No person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working

35

under the foreign terrorist organization's direction and control.

18 U.S.C. 2339B(h). Accordingly, conviction under that provision requires a defendant to knowingly provide one or more persons to work under or to supervise a terrorist organization. If an individual acts independently of the organization, he cannot be held liable.

A person of ordinary intelligence would easily understand the statute's distinction between concerted and independent action. See *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (discussing, in connection with Section 1 of the Sherman Act, 15 U.S.C. 1, "the basic distinction between concerted and independent action"). Just as, for instance, an ordinary person understands the difference between "concerted effort by more than one entity to fix prices or otherwise restrain trade" and "independent activity by a single entity," *Fisher* v. *City of Berkeley*, 475 U.S. 260, 266 (1986), so too he will understand the difference between acting under a foreign terrorist organization's "direction or control" and acting on his own. Indeed, the definition of "personnel" is not significantly different from terms used in other federal statutes that impose criminal liability on persons who act under another's direction or control, see, *e.g.*, 18 U.S.C. 175b(d)(2)(G); 18 U.S.C. 951(d), or on those who manage, supervise, or organize an operation or individual, see, *e.g.*, 18 U.S.C. 225(a)(1); 18 U.S.C. 1169(b)(1); 18 U.S.C. 1960(a).

For that reason, courts have held since IRTPA's enactment that the term "personnel" is not unconstitutionally vague as applied to criminal defendants' intended support to foreign terrorist organizations. See *United States* v. *Taleb-Jedi*, 566 F. Supp. 2d 157, 182 (E.D.N.Y. 2008) ("[I]t is clear that the statute gives a person of

36

ordinary intelligence a reasonable opportunity to know what is prohibited and it also provides explicit standards for those applying it."); *United States* v. *Warsame*, 537 F. Supp. 2d 1005, 1017-1018 (D. Minn. 2008); *United States* v. *Shah*, 474 F. Supp. 2d 492, 497 (S.D.N.Y. 2007); *United States* v. *Awan*, 459 F. Supp. 2d 167, 177-181 (E.D.N.Y. 2006); *United States* v. *Marzook*, 383 F. Supp. 2d 1056, 1063-1068 (N.D. Ill. 2005); cf. *United States* v. *Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002) (pre-IRTPA); *United States* v. *Lindh*, 212 F. Supp. 2d 541, 574 (E.D.Va. 2002) (same).

b.  Petitioners argue that "direction or control" could "mean many things of potential, but uncertain, applicability." Br. 36.  But the statute is not vague simply because some cases may present a close question as to whether a person is acting independently.  That question is no more than a factual issue to be resolved by the jury in a particular case.  See *Williams*, 128 S. Ct. at 1846 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."); *Scales* v. *United States*, 367 U.S. 203, 223 (1961). In some cases, proof of "direction or control" will be clear; in other cases, it will not.  But in no set of cases will a reasonable jury be confused as to the factual question to be determined.

Petitioners' hypotheticals (Br. 36-37) involving the provision of legal or journalistic services to foreign terrorist organizations run aground on this basic point. Whether a defendant works "under [a] terrorist organization's direction or control," 18 U.S.C 2339B(h), is necessarily a fact-dependent and context-specific question, and reasonable factfinders may disagree about the an-

37

swer in a particular case. But that does not mean the question should not be assigned to such factfinders in the first instance. To the contrary, the question whether a defendant has acted under the "direction or control" of another is properly directed to a jury in a particular case, not to this Court in the guise of an as-applied vagueness challenge. The vagueness doctrine steps in only when a question is indeterminate, not when the known facts make an intelligible question difficult to answer.[8]

c. In any event, any vagueness at the margins of the term "personnel" would not help petitioners. They say that they seek to "engage in political advocacy on behalf of the PKK and the Kurds before the U.N. Commission on Human Rights and the United States Congress; * * * write and distribute publications supportive of the PKK and the cause of Kurdish liberation; * * * advocate for the freedom of political prisoners in Turkey

---

[8] Petitioners point (Br. 38) to a statement by government counsel in a different case six years ago, before Congress amended the definition of "personnel." *United States* v. *Sattar*, 272 F. Supp. 2d 348, 360 (S.D.N.Y. 2003). The statement concerned the difference between joining a foreign terrorist organization and providing "personnel" to that organization. As amended by IRTPA, the latter now requires a person "to work under [the] organization's direction or control," 18 U.S.C. 2339B(h), and a person who becomes a member of an organization, without more, does not perform "work" for that organization. Even prior to the enactment of IRTPA, the government at oral argument before the en banc court of appeals disavowed its earlier statement. See *Media for Case* (38:16-38:54 mark) ("He said, 'You know it when you see it.' * * * I don't know if he thought he was being humorous, but it obviously is not the way the law should be read."). The constitutionality of the definition of "personnel" should not stand or fall on the basis of an isolated (and subsequently disavowed) statement made in the heat of oral argument. See *City of Erie* v. *Pap's A.M.*, 529 U.S. 277, 309 n.5 (2000) (Scalia, J., concurring in the judgment).

38

* * * ; and * * * assist PKK members at peace conferences and other meetings." J.A. 58-59. Of course, petitioners could conduct all but the last of those listed activities "entirely independently" of the PKK and LTTE, 18 U.S.C. 2339B(h), in which case their conduct would not be criminal. But petitioners do not wish to do so: they sought to enjoin enforcement of the term "personnel" so that they could coordinate those activities with, and carry them out under the direction and control of, the PKK and LTTE. Because those proposed coordinated activities clearly fall within the statutory definition of "personnel," the court of appeals properly rejected petitioners' as-applied challenge.

> ### 4. *Helping the PKK and LTTE appear before national and international representative bodies constitutes "services"*

a. The term "service" is also not unconstitutionally vague. "Service" refers to "an act done for the benefit or at the command of another" or to "useful labor that does not produce a tangible commodity." *Webster's* 2075. That concept is readily understood by ordinary people. In other contexts, courts of appeals have found similar language to be sufficiently clear to define the scope of criminal liability. See *Humanitarian Law Project* v. *United States Treasury Dep't*, 578 F.3d 1133, 1145-1148 (9th Cir. 2009) (rejecting vagueness challenge to an Executive Order that permits the Secretary of the Treasury to designate entities that provide "financial or other services to or in support of" acts of terrorism); *United States* v. *Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 73, 77 (2d Cir.) (rejecting vagueness challenge to regulations implementing an Executive Order prohibiting any person from engaging in any "service

39

contract" in Iran, because the language in the Executive Order "gave * * * fair notice" of what was prohibited), cert. denied, 479 U.S. 1018 (1986).  The word is no less easy to understand in the material-support statute.

Petitioners focus (Br. 34-35) on the portion of the dictionary definition requiring that "an act [be] done for the benefit * * * of another," but ignore the statutory requirement that a "service" be provided "*to* a foreign terrorist organization."  18 U.S.C. 2339B(a)(1) (emphasis added).  That limitation requires a direct relationship with the foreign terrorist organization that benefits from the proferred service.  See p. 22, *supra*.  A speaker or writer who acts independently of a foreign terrorist organization may in fact benefit that organization, but he does not "knowingly provide[] material support or resources to a foreign terrorist organization" within the meaning of the statute.  Petitioners simply cannot reconcile themselves to the statute's basic distinction between independent and concerted action.

b.  Whatever ambiguity petitioners might generate from viewing the term "service" in isolation, the word is unambiguous in context.  Section 2339A(b)(1) forbids providing a number of types of support to foreign terrorist organizations, including "currency or monetary instruments or financial securities, financial services, lodging, * * * safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, * * * and transportation."  The term "service" must be understood in the context of those other types of material support.  See, *e.g.*, *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps."); *Jarecki* v. *G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis*, * * * while not an ines-

40

capable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."). As this list indicates, Congress was concerned with "service[s]" that are rendered directly to a foreign terrorist organization, not to any and all acts that may be of some benefit.

Similarly, petitioners are incorrect (Br. 39) that the term "service" should be read to include the types of conduct expressly excluded from the definitions of "training," "expert advice or assistance," and "personnel." This Court interprets statutes to avoid constitutional doubts, not to create them. See, *e.g.*, *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Accordingly, "the various provisions of the Act should be read *in pari materia*," *United States* v. *Riverside Bayview Homes, Inc.*, 474 U.S. 121, 138 n.11 (1985), and the term "service" should not be expanded to cover types of conduct expressly excluded by other statutory provisions. Petitioners cite (Br. 39) cases upholding vagueness challenges when the statutory text was "active[ly] misleading," *Raley* v. *Ohio*, 360 U.S. 423, 438 (1959), or issued "[i]nexplicably contradictory commands," *ibid.* (describing *United States* v. *Cardiff*, 344 U.S. 174 (1952)). Neither of those two circumstances is remotely present here.

Moreover, even if the term "service" can plausibly be read as petitioners suggest, it no less reasonably can be interpreted to mean an action "done * * * at the command of" that organization to further its goals and objectives. *Webster's* 2075. Interpreted in that way, the statute would raise no vagueness concern at all. It is well-settled that "when 'a statute is susceptible of two

41

constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the Court's] duty is to adopt the latter.'" *Harris* v. *United States*, 536 U.S. 545, 555 (2002) (quoting *United States ex rel. the Att'y Gen. of the United States* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)). The statute's text plainly requires that a "service" be rendered "to" a foreign terrorist organization (which requires a direct relationship). Any remaining ambiguity is easily avoided by interpreting the statute to require that a "service" be done at the terrorist organization's command or behest.[9]

c. Although their hypotheticals suggest otherwise (Br. 34-35), petitioners do not seek to render an indirect benefit to the PKK and LTTE. Rather, they want to render benefit *directly* to those groups by coordinating their actions. As petitioners explain, they seek to "assist[] the PKK in appearing before national and international representative bodies such as the United Nations Human Rights Subcommission, the Council of Europe, the United States Congress, and international human rights conferences." J.A. 98. In particular, petitioners seek "to provide training and expert advice and assistance * * * on how to bring claims and appeals of Kurds before the UN and other policy making bodies." J.A. 99. Petitioners' proposed conduct therefore falls squarely within the term "service" on any interpreta-

---

[9] Petitioners claim that they are forced "to guess whether joining or affiliating with a group is prohibited" by the term "service." Br. 35. But joining an organization is not usually thought of as providing a "service" to that organization. Petitioners remain free to join or affiliate with the PKK or LTTE. See p. 59-60, *infra*. What petitioners may not do is provide material support or resources to the organization, regardless of whether they are members or affiliates.

42

tion. Again, petitioners cannot prevail by pointing to purported vagueness at the margins of the material-support statute, when their proposed activities rest comfortably within its core.

### B. The Court Of Appeals Confused The Vagueness And Overbreadth Doctrines

The decision of the court of appeals rested in large part on the court's view that prohibiting the provision of any "training," "expert advice or assistance," or "service" to a terrorist group would violate the First Amendment. For example, the court reasoned that "training" is vague because it could "be read to encompass speech and advocacy protected by the First Amendment." Pet. App. 22a; see *id.* at 24a ("Because the 'other specialized knowledge' portion of the ban on providing 'expert advice or assistance' continues to cover constitutionally protected advocacy, we hold that it is void for vagueness."); *id.* at 25a (holding that "service" is vague in part "because it is easy to imagine protected expression that falls within the bounds of the term 'service'") (first set of internal quotation marks omitted).

Petitioners understandably make no effort to defend that rationale, because the court of appeals' analysis erroneously conflated two separate constitutional doctrines: vagueness and overbreadth. If the court were correct that "training" could "be read to encompass speech and advocacy protected by the First Amendment," Pet. App. 22a, then the statute might be unconstitutional, as a matter of substantive First Amendment law, in some of its applications. And if those applications were sufficiently numerous in relation to the legitimate applications of the statute, then the statute would be vulnerable to an overbreadth challenge. See *Williams,*

43

128 S. Ct. at 1838 ("[W]e have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."); *Virginia* v. *Hicks*, 539 U.S. 113, 119-120 (2003).

Overbreadth and vagueness, however, are distinct doctrines, and the coverage of a statute, by itself, has nothing to do with whether its meaning is unclear. See *Massachusetts* v. *EPA*, 549 U.S. 497, 532 (2007) (That a statute can be applied in many different situations "does not demonstrate ambiguity. It demonstrates breadth."); *Grayned*, 408 U.S. at 114 ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."). Accordingly, the court of appeals erred by conflating petitioners' claim under the Fifth Amendment (*i.e.*, that the statute is unconstitutionally vague) with their claims under the First Amendment (*i.e.*, that the statute unconstitutionally infringes on their rights of free speech and association). For the reasons set forth earlier, the contested terms in the material-support statute all have a clear meaning to an ordinary person, and the former claim therefore lacks merit. And as shown in the next part, the latter claims fare no better.

## II. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID TO KNOWN TERRORIST ORGANIZATIONS DO NOT VIOLATE THE FIRST AMENDMENT

Petitioners' claims of content-based discrimination (Br. 43-55), overbreadth (Br. 42-43), and violation of associational rights (Br. 56-59) have no merit. The material-support statute is a generally applicable regulation of conduct that only incidentally affects expressive activity, rather than a content-based restriction on

44

speech. Even assuming *arguendo* that certain applications of the statute to expression violate the First Amendment, the statute is not overbroad because those applications are not substantial in relation to the statute's plainly legitimate sweep. And the statute does not prevent petitioners from joining or otherwise associating with foreign terrorist organizations. For those reasons, the lower courts, including the courts below, have uniformly rejected arguments that the material-support statute violates the First Amendment.

## A. The Statute Is A Regulation Of Conduct That Only Incidentally And Permissibly Affects Expression

Petitioners argue (Br. 23-25, 43-50) that the material-support statute is a content-based regulation of speech subject to strict scrutiny. As the court of appeals held, however, the statute is in fact a regulation of conduct, applying irrespective of any expressive content, and is therefore subject to intermediate scrutiny under *O'Brien*. See Pet. App. 28a; *Humanitarian Law Project*, 205 F.3d at 1135. The statute easily survives such scrutiny because it is narrowly tailored to advance important governmental interests unrelated to the suppression of expression. *Id.* at 1135-1136.

### 1. Section 2339B regulates conduct without regard to its expressive content

a. Petitioners attempt to frame the material-support statute as a law aimed at "pure speech addressing political issues." Br. 23; *id.* at 23-25. Nothing could be further from the truth. Petitioners remain free, as they say that they wish, "to lobby Congress, to teach and advise on human rights, to promote the peaceful resolution of political disputes, and to advocate for the human rights of minority populations." *Id.* at 23. What petitioners

45

may not do under the statute is something different: engage in certain activities in coordination with, or under the direction or control of, groups that they know have been designated as terrorist organizations or have engaged in terrorist activity. In enacting the material-support statute, Congress regulated a particular type of conduct (*i.e.*, providing direct aid to known terrorist organizations), not a particular type of expression (*e.g.*, advocating for the advancement of human rights). The prohibition on conduct set out in the statute applies irrespective of whether a person conveys a particular message or engages in any expression at all.

For that reason, petitioners' citations (Br. 24, 40) of cases involving content-based restrictions on speech have no relevance here. Section 2339B does not target expression at all, let alone expression of a certain content or viewpoint. It therefore bears no resemblance to the laws that petitioners cite prohibiting the transmission of indecent or offensive telecommunications to minors, *Reno*, 521 U.S. at 871; the distribution of anonymous campaign literature, *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); the publication of offensive information about a person's private affairs, *Cox Broad. Corp.* v. *Cohn*, 420 U.S. 469, 495 (1975); or the use of vulgar language, *Cohen* v. *California*, 403 U.S. 15, 16 (1971). Unlike those laws, Section 2339B does not prohibit expression except incidentally, and does not punish any person because he is conveying a particular message.

Rather, Section 2339B aims at a certain type of conduct: the provision of material support or resources to foreign terrorist organizations. The statute applies whether the proferred aid takes the form of "property" (like "currency or monetary instruments or financial

46

securities, lodging, * * * safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, [or] explosives") or "service[s]" (like "financial services, * * * training, expert advice or assistance, * * * personnel * * *, [or] transportation"). 18 U.S.C. 2339A(b)(1). The statute thus establishes a broad ban on providing any property or service, other than "medicine or religious materials," to a known terrorist organization. *Ibid.* Sections 2339A and 2339B say nothing about speech, much less about the content of any speaker's message. See *City of L.A.* v. *Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring in the judgment) ("[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based."). Those provisions, on their face, regulate specified activities in aid of terrorism.

Contrary to petitioners' argument (Br. 42), the First Amendment analysis is not altered because the statute prohibits "training" and "expert advice or assistance," which usually are accomplished through the use of words. Conspiracy is typically accomplished through words; so too fraud, bribery, and extortion. Training or providing expert advice to terrorists parallels those longstanding crimes. That a particular course of conduct may be—or, indeed, invariably is—effectuated through words does not control the constitutional analysis. The relevant inquiry in a case like this one is whether the statute at issue targets speech directly or instead only incidentally restricts speech as part of regulating harmful activity. See *United States* v. *Albertini*, 472 U.S. 675, 687 (1985) ("Application of a facially neutral regulation that incidentally burdens speech satisfies the

47

First Amendment" if it meets the *O'Brien* test.); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 604 (2001) (Stevens, J., concurring in part) ("This Court has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression."). The material-support statute, as the court of appeals recognized, does the latter: it aims at the act of giving material support to terrorists—regardless whether accomplished through words and, if accomplished through words, regardless of their expressive content. See Pet. App. 28a (citing *Humanitarian Law Project*, 205 F.3d at 1135).

Nor does it matter to the constitutional analysis whether, in cases in which material support to terrorists takes the form of words, the words at issue are intrinsically blameworthy (*e.g.*, training on how to build a bomb) or seemingly benign (*e.g.*, advice on international law or computer programming). Petitioners even admit as much. See Br. 45 ("[T]he statute's prohibitions reach even speech that is designed to *discourage* terrorism and to promote only lawful, nonviolent activities."). In every instance, the statute's aim is not the content or viewpoint of the speech, but the act of aiding deadly terrorist organizations.

b. Eleven judges of the Ninth Circuit, sitting en banc, unanimously rejected petitioners' content-based discrimination argument on this essential reasoning, referring to an earlier panel opinion. See 393 F.3d at 902. That opinion, in turn, held that "the material support restriction here does not warrant strict scrutiny because it is not aimed at interfering with the expressive component of [petitioners'] conduct but at stopping aid

48

to terrorist groups." *Humanitarian Law Project*, 205 F.3d at 1135. It further held that "[i]ntermediate scrutiny applies where, as here, 'a regulation . . . serves purposes unrelated to the content of expression.'" *Ibid.* (quoting *Ward*, 491 U.S. at 791). Applying intermediate scrutiny, it concluded that the material-support statute satisfies that standard. *Id.* at 1135-1136.

Likewise, the Fourth Circuit, also sitting en banc, has rejected petitioners' argument. See *United States* v. *Hammoud*, 381 F.3d 316 (2004), vacated on other grounds, 543 U.S. 1097, reinstated in relevant part, 405 F.3d 1034 (4th Cir. 2005). In *Hammoud*, the court held that the material-support statute is a "facially neutral statute [that] restricts some expressive conduct." As such, the court held, the statute is subject to intermediate scrutiny, which it satisfies. *Id.* at 329. The District of Columbia and Seventh Circuits have rejected similar claims. *People's Mojahedin Org. of Iran* v. *Department of State*, 327 F.3d 1238, 1244-1245 (D.C. Cir. 2003) ("It is conduct and not communication that the statute controls."); *Boim* v. *Quranic Literacy Inst.*, 291 F.3d 1000, 1025-1027 (7th Cir. 2002) ("Under section 2339B, * * * [defendants] may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas. Section 2339B prohibits only the provision of material support (as that term is defined) to a terrorist organization."); cf. *Boim* v. *Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008) (en banc), cert. denied, 130 S. Ct. 458 (2009) (*Holy Land*). Petitioners do not point to any decision of any court holding that the material-support statute is a content-based restriction on speech.

49

### 2. Petitioners' arguments that Section 2339B is a content-based restriction on speech are meritless

a. Petitioners are correct (Br. 45) that the material-support statute is not a content-neutral restriction on the time, place, or manner of their proposed speech. But it does not follow, as petitioners argue, that the statute then must be a content-based restriction on their speech. In fact, as explained above, the statute fits into neither of those categories of speech restrictions; it is instead a generally applicable regulation of conduct that only incidentally impinges on expression. This Court has frequently upheld the application of such statutes to criminalize or otherwise restrict some expression as part of the class of targeted conduct. See *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 189 (1997); *Wayte* v. *United States*, 470 U.S. 598, 611 (1985); *O'Brien*, 391 U.S. at 377. The Court has never insisted that such an incidental restriction on speech, assuming it passes muster under the *O'Brien* test, also somehow incorporate characteristics of time, place, or manner regulation.

b. Petitioners assert that "a ban on speech to a chosen audience"—*i.e.*, foreign terrorist organizations—"triggers strict First Amendment scrutiny." Br. 46. Again, the material-support statute is importantly different from the laws cited by petitioners (Br. 46 n.24) restricting editorials by educational broadcasting stations, *FCC* v. *League of Women Voters*, 468 U.S. 364, 366 (1984), or electioneering communications by unions and corporations, *McConnell* v. *Federal Election Comm'n*, 540 U.S. 93, 204 (2003). Unlike those laws, Section 2339B does not restrict a particular kind of speech, by a particular set of speakers, for the benefit of the public. Petitioners are free to communicate with the public, as the speakers wished to do in the cases that petitioners

50

cite, about ideas held by the PKK and LTTE. And just as importantly, petitioners are free to join and communicate with the members of the PKK or LTTE, so long as they do not use that communication as a vehicle for conveying material assistance. That is because Section 2339B regulates not speakers attempting to reach particular audiences, but providers of property and services seeking to assist organizations defined by their terrorist conduct.

c. Petitioners contend (Br. 48-50) that the statute is content-based because it prohibits material support only to certain foreign terrorist organizations (as designated by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General). The Secretary of State, however, has the authority to designate such an organization only if she finds that it "engages in terrorist activity" that "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. 1189(a)(1).[10] In other words, the designation itself is based on groups' conduct, not on the content of their speech or the nature of their political beliefs. Cf. Pet. Br. 49-50 (hypothesizing a statute that favored particular political parties). Congress thus did not prohibit speech in support of certain disfavored speakers; it instead prohibited conduct in support of certain dangerous actors. And petitioners point to no evidence in this as-applied challenge that the PKK and LTTE were designated as terrorist organizations based

---

[10] In the event that an organization wishes to dispute the basis for its designation, it may file a petition for review in the District of Columbia Circuit. 8 U.S.C. 1189(c). Here, the LTTE challenged its designation, which the District of Columbia Circuit upheld. *People's Mojahedin Org. of Iran*, 182 F.3d at 24-25.

51

on anything other than their commission of terrorist acts.

Similarly, petitioners argue (Br. 48) that the material-support statute is content-based because its terms distinguish between various types of conduct. For instance, the term "training" prohibits imparting a specific skill but not general knowledge; and the term "expert advice or assistance" applies only to scientific, technical, or other specialized knowledge. But this Court "[has] never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill*, 530 U.S. at 721. Congress distinguished between general and specialized knowledge in order to identify the types of training or expert assistance that—like providing safehouses or weapons—are particularly likely to advance the goals and objectives of terrorist groups. Classifications between forms of support to organizations, based on such neutral and legitimate governmental interests, do not become content-based restrictions on speech because they incidentally affect some but not all expressive activity. See *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").[11]

---

[11] Petitioners also claim (Br. 48) that the statute is content-based because it permits the provision of medicine and religious materials. See 18 U.S.C. 2339A(b)(1). The court of appeals correctly found that Congress "is entitled to strike such delicate balances," in recognition of humanitarian and religious values, "without giving up its ability to prohibit other types [of] assistance which would promote terrorism." *Humanitarian Law Project*, 205 F.3d at 1136 n.4.

52

### 3. Section 2339B is narrowly tailored to advance important governmental interests

a. Because it regulates conduct and only incidentally restricts speech, the material-support statute is subject to intermediate scrutiny. See *Albertini*, 472 U.S. at 687-688; *O'Brien*, 391 U.S. at 377. The lower courts in this case, joining every court to face the issue, concluded that Section 2339B easily survives such scrutiny: it is within Congress's power to enact; it promotes an important (indeed, compelling) government interest; it is aimed at stopping aid to terrorists, rather than at suppressing free expression or association; and it is reasonably tailored, restricting expressive rights no more than is necessary. See *Humanitarian Law Project*, 205 F.3d at 1135-1136; see also *Hammoud*, 381 F.3d at 329 ("Section 2339B satisfies all four prongs of the *O'Brien* test.").

Petitioners understandably do not dispute that Section 2339B satisfies the first, second, and third prongs of the *O'Brien* test. First, Congress "clearly has the power to enact laws restricting the dealings of United States citizens with foreign entities; such regulations have been upheld in the past over a variety of constitutional challenges." *Humanitarian Law Project*, 205 F.3d at 1135 (citing cases). In their brief, petitioners advance (Br. 49, 70) hypotheticals involving the regulation of speech in the domestic context. But the material-support statute is fundamentally different: it restricts individuals' ability to act in concert with foreign entities. See, *e.g.*, *DKT Mem'l Fund Ltd.* v. *Agency for Int'l Dev.*, 887 F.2d 275, 295 (D.C. Cir. 1989) ("[T]he right of Americans to associate with nonresident aliens is not an absolute.") (internal quotation marks and citation omitted). Such a regula-

53

tion is within "[t]he constitutional power of Congress." *O'Brien*, 391 U.S. at 377.

Second, "the government has a legitimate interest in preventing the spread of international terrorism, and there is no doubt that that interest is substantial." *Humanitarian Law Project*, 205 F.3d at 1135; see *Wayte*, 470 U.S. at 611 ("Few interests can be more compelling than a nation's need to ensure its own security."). Since 2001, the United States has charged approximately 150 defendants with violations of the material-support provision of 18 U.S.C. 2339B, and to date approximately 75 defendants have been convicted. Several of those prosecutions have involved the provision of "training," "expert advice or assistance," "personnel" or "service," see *United States* v. *Kassir*, No. 04 CR 356 (JFK), 2009 WL 2913651, at *1 (S.D.N.Y. Sept. 11, 2009) (defendant convicted for providing jihad training to young men and disseminating training manuals to terrorist groups, among them al Qaeda), including to the LTTE, one of the terrorist organizations at issue here, see *United States* v. *Kandasamy*, No. 06 CR 616 (RJD), 2008 WL 2660610, at *1 (E.D.N.Y. July 3, 2008) (alleging that a defendant "assisted LTTE members in procuring military weaponry worth millions of dollars, including missiles, firearms, explosives, artillery and radar"), aff'd, No. 08-3589-CR, 2009 WL 692113 (2d Cir. Mar. 18, 2009). Those prosecutions, and others like them under the material-support statute, have prevented substantial harm to the nation.

Third, the government's interest in preventing the spread of terrorism and the occurrence of terrorist acts "is unrelated to suppressing free expression because [Section 2339B] restricts the actions of those who wish to provide material support to [terrorist] groups, not the

54

expression of those who advocate or believe the ideas that the groups support[]." *Humanitarian Law Project*, 205 F.3d at 1135; see *Hammoud*, 381 F.3d at 329 ("Hammoud is free to advocate in favor of Hizballah or its political objectives—§ 2339B does not target such advocacy."); *Taleb-Jedi*, 566 F. Supp. 2d at 177 ("Defendant remains free to sympathize with or advocate in favor of the PMOI."). In enacting Section 2339B, Congress prohibited the forms of support to terrorist organizations that strengthen their capacity to commit acts of violence and destruction. Congress did not prohibit individuals from joining terrorist groups, expressing solidarity with them, or even inciting others to engage in terrorist conduct. And petitioners have not presented any evidence that the statute would be applied in this case for any purpose related to suppressing expression. The third prong of *O'Brien* is thus also met.

b. Petitioners dispute (Br. 65) that Section 2339B is tailored to its goal, but their claim that Congress was "[w]ithout evidence" to support Section 2339B's prohibition ignores the rationale established in the legislative record. *Ibid.* There, Congress found that terrorist organizations "have established footholds within ethnic or resident alien communities in the United States" and can "operate under the cloak of a humanitarian or charitable exercise." H.R. Rep. No. 383, 104th Cong., 1st Sess. 43 (1995) (*1995 House Report*) (report on predecessor bill). Congress further found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA § 301(a)(7), 110 Stat. 1247.

In particular, Congress determined that "the fungibility of financial resources and other types of material

55

support" would permit individuals "to supply funds, goods, or services to an organization," which would "help[] defray the cost to the terrorist organization of running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities." *1995 House Report* 81. As Congress explained, "[t]here is no other mechanism, other than an outright prohibition on contributions, to effectively prevent such organizations from using funds raised in the United States to further their terrorist activities abroad." *Id.* at 45. As the court of appeals concluded, "[i]t follows that all material support given to such organizations aids their unlawful goals." *Humanitarian Law Project*, 205 F.3d at 1136.

According to the State Department, "[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly supports this congressional finding." J.A. 133. "[I]t is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions," because they "do not maintain organizational 'firewalls' that would prevent or deter such sharing and commingling of support and benefits." J.A. 133, 135 (emphasis omitted). Moreover, to the extent that some terrorist groups have "political or humanitarian components," they use those components "to support the establishment of logistical infrastructure (communications, housing and the like) and intelligence networks," J.A. 134, "to recruit personnel to carry out terrorist operations," and "to provide support to criminal terrorists and their families in aid of such operations," J.A. 135.

Petitioners claim (Br. 12, 65) that they intend to discourage terrorism, but their motives are irrelevant in

56

light of Congress' findings. In Congress' view, providing assistance, whether tangible or intangible, frees resources that terrorists can and often do allocate to criminal and violent activities. J.A. 136-137. And even the provision of seemingly benign services (like legal advice or communications assistance) bolsters a terrorist organization's efficacy and strength in a community, thus undermining this nation's efforts to delegitimize and weaken these groups. See *Holy Land*, 549 F.3d at 698 ("Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities.").

Although petitioners previously sought to provide funds to the PKK and LTTE (Br. 16 n.10), they now concede that the statute is constitutional as applied to "financial aid and non-speech support." *Id.* at 55. It is certainly true that funds given to terrorist organizations, even for avowedly political or humanitarian purposes, can be used to support terrorist activities. See ADL Amicus Br. 19-31 (detailing use of humanitarian aid for terrorist efforts by the PKK, LTTE and Hamas). But it is equally true, in Congress' view, that other types of support—including personnel, training, and other services—can have similarly harmful consequences for American interests. Petitioners attempt to second-guess that judgment, but this Court should not. That is especially so because this case involves sensitive national security and foreign affairs interests, to which a heightened degree of deference to Congress and the Executive Branch is warranted. *Humanitarian Law Project*, 205 F.3d at 1136 ("Because the judgment of how best to achieve that end [of combating terrorism] is strongly bound up with foreign policy considerations, we

57

must allow the political branches wide latitude in select-ing the means to bring about the desired goal."); see *Regan* v. *Wald*, 468 U.S. 222, 242 (1984); *Haig* v. *Agee*, 453 U.S. 280, 292 (1981).

Likewise, petitioners conceded in the lower courts that the government could prohibit all forms of material support to al Qaeda.  See Pet. C.A. Br. 32 n.13; *Media for Case* (13:53-14:10).   Petitioners' argument thus amounts to a claim that Congress may not expand the prohibition beyond al Qaeda to other terrorist groups. Whatever the basis for that argument, it cannot have to do with vagueness, content-discrimination, or associa-tional rights.  In fact, petitioners' rationale must be that aid to al Qaeda inevitably supports terrorist activities, while aid to other terrorist organizations does not.  But Congress reached a different judgment, and that judg-ment is the one entitled to respect.  This Court should reject petitioners' attempt to cloak in constitutional garb what petitioners' own arguments reveal to be an attack on legislative policy.

### B.  The Statute Is Not Overbroad

To be overbroad, a statute must prohibit a "substan-tial" amount of protected expression, judged in absolute terms and in relation to the law's plainly legitimate sweep.  *Hicks*, 539 U.S. at 119-120; see *Williams*, 128 S. Ct. at 1838. Even assuming Section 2339B has any unconstitutional applications, they are insufficiently sub-stantial, either in absolute number or in relation to the statute's plainly legitimate sweep, to render the statute unconstitutionally overbroad.  For that reason, lower courts have uniformly rejected overbreadth challenges

58

to Section 2339B.[12] That uniform conclusion is not surprising, given the nature of the material-support statute. As this Court has observed, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124.

The court of appeals noted Section 2339B's "many legitimate applications." Pet. App. 28a. For instance, "[it] can legitimately be applied to criminalize facilitation of terrorism in the form of providing foreign terrorist organizations with income, weapons, or expertise in constructing explosive devices." *Ibid.* Petitioners themselves see no constitutional difficulty in applying the statute to "material support in the form of financial aid and other non-speech support." Br. 55. That concession is fatal to their overbreadth claim. It means, as the court below held, that "although [petitioners] may be able to identify particular instances of protected speech that may fall within the statute, those instances are not substantial when compared to the legitimate applications of [S]ection 2339B(a)." Pet. App. 29a. At the least, petitioners make no effort to demonstrate that any overbreadth is substantial in relation to Section 2339B's plainly legitimate sweep.

Moreover, as this Court has explained, "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally

---

[12] See, *e.g.*, *Hammoud*, 381 F.3d at 330; *Taleb-Jedi*, 566 F. Supp. 2d at 185; *Warsame*, 537 F. Supp. 2d at 1016; *Shah*, 474 F. Supp. 2d at 499 n.6; *Awan*, 459 F. Supp. 2d at 180; *United States v. Assi*, 414 F. Supp. 2d 707, 717 (E.D. Mich. 2006); *Marzook*, 383 F. Supp. 2d at 1062-1063; *United States* v. *Sattar*, 272 F. Supp. 2d 348, 362 (S.D.N.Y. 2003).

59

unprotected conduct." *Hicks*, 539 U.S. at 119; see Pet. App. 28a. If petitioners were correct that the material-support statute is overbroad on its face, then the government would not be able to enforce the statute in any of its applications. The court of appeals rightly recognized that such a holding "would potentially be placing our nation in danger of future terrorist attacks." *Id.* at 29a.

### C. The Statute Does Not Infringe Petitioners' Right Of Association

Likewise, the court of appeals properly rejected petitioners' argument (Br. 56-59) that the material-support statute targets association protected under the First Amendment: "The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. [Petitioners] are even free to praise the groups for using terrorism as a means of achieving their ends. What [the statute] prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions." *Humanitarian Law Project*, 205 F.3d at 1133; see *Hammoud*, 381 F.3d at 329 ("Hammoud's argument fails because § 2339B does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated [foreign terrorist organization].").

Indeed, Congress took special care not to infringe upon associational rights. Recognizing that "[t]he First Amendment protects one's right to associate with groups that are involved in both legal and illegal activities," *1995 House Report* 43, Congress observed that the statutory ban "only affects one's contribution of financial

60

or material resources" because "[t]he First Amendment's protection of the right of association does not carry with it the 'right' to finance terrorist, criminal activities," *id.* at 44. Congress made clear, however, that "[t]hose inside the United States will continue to be free to advocate, think, and profess the attitudes and philosophies of the foreign organizations." *Id.* at 45. Accordingly, "[t]he basic protection of free association afforded individuals under the First Amendment remains in place." *Id.* at 44.

Petitioners cite (Br. 57 n.30) a number of cases involving attempts to attach civil or criminal sanctions to membership in the Communist Party. Those cases hold that attaching liability to membership in an organization requires proof of specific intent to further that group's unlawful (rather than its lawful) activities. See *United States* v. *Robel*, 389 U.S. 258, 262, 265-266 (1967); *Keyishian* v. *Board of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 609-610 (1967); *Noto* v. *United States*, 367 U.S. 290, 299-300 (1961). But that specific intent requirement applies only when "liability [is] imposed by reason of association alone." *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982). Here, Section 2339B does not prevent petitioners from becoming members of the PKK and LTTE or impose any sanction on them for doing so. The provision sanctions an entirely different activity, which need not and often does not have any relation to membership.

Petitioners rely (Br. 57-58) extensively on *De Jonge* v. *Oregon*, 299 U.S. 353 (1937), which set aside a state criminal conviction "for merely assisting at a meeting called by the Communist Party at which nothing unlawful was done or advocated." *Id.* at 357. But the only assistance involved in that case was advocacy of the

61

Communist Party and its views. As this Court explained, "peaceable assembly for lawful discussion cannot be made a crime." *Id.* at 365. Section 2339B is fully consistent with this principle: it does not prevent petitioners from peaceably assembling with members of the PKK and LTTE for lawful discussion. It prevents the separate step of rendering material support, in the form of property or services, to these groups based on their demonstrated willingness to commit acts of terror rather than on their political views.

Finally, petitioners argue (Br. 62-63), in reliance on *Boy Scouts of Am.* v. *Dale*, 530 U.S. 640 (2000), and *Elrod* v. *Burns*, 427 U.S. 347 (1976), that Section 2339B directly regulates expressive association. In *Dale*, this Court found that the Boy Scouts of America was "an expressive association" and that a statute forbidding its exclusion of gays and lesbians would "significantly affect its expression." 530 U.S. at 656. The Court therefore concluded that the statute "directly and immediately affect[ed] associational rights," requiring the application of strict scrutiny. *Id.* at 659; see *Elrod*, 427 U.S. at 363 n.17 (plurality opinion) (finding that the political patronage dismissals at issue sought to control "association and belief *per se*"). By contrast, Section 2339B does not regulate the membership of any organization, expressive or otherwise. Nor does Section 2339B compel any organization to convey a message at odds with its fundamental beliefs, as did the statute in *Dale*. See 530 U.S. at 653-654. Section 2339B prohibits only the provision of aid to terrorists, and to the extent it burdens associational rights at all, it does so only incidentally.

62

## III. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID DO NOT REQUIRE SPECIFIC IN-TENT TO FURTHER THE TERRORIST ORGANIZA-TION'S UNLAWFUL ACTIVITIES

1. Before the court of appeals, petitioners argued that the material-support statute imposes "guilt by asso-ciation" in violation of the Fifth Amendment's Due Pro-cess Clause unless it is interpreted to require specific intent to further a terrorist organization's unlawful ac-tivities. See Pet. C.A. Br. 19-36; Pet. C.A. Reply Br. 11-19.[13] Petitioners made the same argument in passing in their cross-petition to this Court. See Cross-Pet. 11 & n.10. In their opening brief, however, petitioners abandon that argument. Nowhere do they argue that the statute violates due process because it imposes guilt by association. To be sure, petitioners assert in a foot-note that they "have preserved the argument[]," Br. 43 n.23, but that reference is insufficient to justify this Court's review. See *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 735 n.24 (2004) ("[Respondent's] brief contains one footnote seeking to incorporate by reference [certain] arguments * * * before the Court of Appeals. That is not enough to raise the question fairly, and we do not consider it.") (internal citation omitted).

Petitioners now raise a different avoidance argu-ment. Rather than claim that the material-support stat-ute violates due process if not interpreted to require

---

[13] The lower courts rejected petitioners' argument that the material-support statute imposes guilt by association. See Pet. App. 13a-19a; *id.* at 18a ("In sum, because section 2339B does not impose 'vicarious criminal liability,' due process is satisfied without proof of specific intent to further the organization's illegal goals."); *id.* at 19a ("Because there is no Fifth Amendment due process violation, we affirm the district court on this issue.").

63

specific intent, petitioners contend (Br. 65-69 & n.32) that this Court can avoid resolving all of petitioners' constitutional claims by construing the statute to require specific intent. The lower courts had no opportunity to address that contention. And this Court should decline to address an argument raised for the first time—after 11 years of litigation, *id.* at 5a—in petitioners' opening brief. *FCC* v. *Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1819 (2009) ("This Court * * * is one of final review, not of first view.") (internal quotation marks and citation omitted); see *NCAA* v. *Smith*, 525 U.S. 459, 470 (1999); *United States* v. *Bestfoods*, 524 U.S. 51, 72-73 (1998).

2. In any event, construing the statute to require specific intent would not avoid resolution of petitioners' constitutional claims. Petitioners' vagueness claim under the Fifth Amendment would remain, because requiring a heightened *mens rea* does nothing to clarify what *actus reus* violates the statute. For example, the term "training," as defined by the statute, prohibits imparting a specific skill but not general knowledge to a foreign terrorist organization. If petitioners are correct that there is no intelligible difference between those two acts, then even someone who intends to further unlawful terrorist activity cannot be certain when his instruction has strayed into forbidden territory. Moreover, petitioners' facial overbreadth claim under the First Amendment apparently would remain, because petitioners maintain that their construction, although protecting their own activities, "would not necessarily save the statute's constitutionality in every context." Br. 66 n.32 (emphasis omitted). Petitioners' proposed avoidance strategy thus fails to deliver its purported benefits.

64

3. a. Moreover, as the court of appeals explained, the strategy is unavailable because the material-support statute simply does not require specific intent to further unlawful terrorist activities. Pet. App. 13a-19a; see *Scales*, 367 U.S. at 211 ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute."). This Court has "long recognized that determining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.'" *Staples* v. *United States*, 511 U.S. 600, 605 (1994) (quoting *United States* v. *Balint*, 258 U.S. 250, 253 (1922)). In IRTPA, Congress amended the material-support statute to make the scienter requirement unmistakable: "a person must have knowledge that the organization is a designated terrorist organization * * *, that the organization has engaged or engages in terrorist activity * * *, or that the organization has engaged or engages in terrorism." 18 U.S.C. 2339B(a)(1). Petitioners' proposed specific intent requirement is flatly inconsistent with Congress' express scienter requirement.

Congress' rejection of a specific intent requirement is even clearer when Section 2339B (which prohibits providing material support to foreign terrorist organizations) is placed alongside Section 2339A (which prohibits providing material support to terrorists) and Section 2339C (which prohibits financing terrorism). In both Sections 2339A and 2339C, Congress required the specific intent to further acts of terrorism. See 18 U.S.C. 2339A(a); 18 U.S.C. 2339C(a)(1). Indeed, Section 2339A(a) has precisely the specific intent requirement that petitioners urge here: it prohibits "provid[ing] ma-

65

terial support or resources * * * , knowing or intending that they are to be used in preparation for, or in carrying out" various criminal acts. If Congress had intended the same requirement to apply in Section 2339B, it could and would have said so. See *Warsame*, 537 F. Supp. 2d at 1013 ("Congress's inclusion of an explicit *mens rea* requirement in § 2339A strongly suggests that it chose not to include a specific intent requirement in § 2339B.").

Indeed, Congress added IRTPA's scienter requirement in the face of conflicting judicial decisions on the subject. Whereas some decisions had held that the prior version of the statute required only knowledge that the donee organization was a designated foreign terrorist organization or engaged in terrorist activities, see 352 F.3d at 400; see also *Hammoud*, 381 F.3d at 342 & n.12, other decisions had interpreted the statute to require the specific intent to further the organization's unlawful activities, see *United States* v. *Al-Arian*, 308 F. Supp. 2d 1322, 1339 (M.D. Fla. 2004); cf. *Hammoud*, 381 F.3d at 374-380 (Gregory, J., dissenting). Congress is presumed aware of the legal backdrop against which it acts, *Cannon* v. *University of Chi.*, 441 U.S. 677, 696-697 (1979), and here Congress' decision not to require specific intent to further a terrorist organization's unlawful activities was specifically intended to settle the judicial conflict.

b. Petitioners rely (Br. 66-69) for their approach on *Scales, supra*. That case concerned a clause in the Smith Act, 18 U.S.C. 2385, prohibiting membership in "any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any [domestic] government by force or violence; * * * knowing the purposes thereof." This Court held that a

66

member can violate that clause only if he possesses "knowledge of the [group's] illegal advocacy and a specific intent to bring about violent overthrow." *Scales*, 367 U.S. at 220.

Once again, petitioners attempt to equate the material-support statute with a prohibition on membership. But as the court of appeals explained, *Scales* is importantly different from this case. Pet. App. 16a. Unlike Section 2339B, the Smith Act aims directly at freedom of association. In that context, specific intent is necessary to distinguish protected association from unprotected (and potentially violent) conduct. See *Scales*, 367 U.S. at 229; *ibid.* ("If there were a similar blanket prohibition of association with a group having both legal and illegal aims, there would indeed be a real danger that legitimate political expression or association would be impaired."). By contrast, Section 2339B does not target First Amendment rights, and "does not proscribe membership in or association with the terrorist organizations." Pet. App. 16a. Rather, it targets a form of conduct—*i.e.*, the provision of material support or resources to foreign terrorist organizations—that does not merit special constitutional protection. And unlike the Smith Act, Section 2339B specifies the knowledge required to make such conduct criminal: knowledge that the recipient is a designated foreign terrorist organization or engages in terrorist activities. No element of specific intent is therefore necessary to separate wrongful from innocent conduct. See *Carter* v. *United States*, 530 U.S. 255, 269 (2000) (requiring courts "to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct") (internal quotation marks and citation omitted).

67

## CONCLUSION

The judgment of the court of appeals should be reversed insofar as it held certain terms in Sections 2339A and 2339B unconstitutionally vague and in all other respects affirmed.

Respectfully submitted.

ELENA KAGAN
  *Solicitor General*
TONY WEST
  *Assistant Attorney General*
NEAL KUMAR KATYAL
  *Deputy Solicitor General*
JEFFREY B. WALL
  *Assistant to the Solicitor
    General*
DOUGLAS N. LETTER
JOSHUA WALDMAN
  *Attorneys*

DECEMBER 2009

Blank Page

# EXHIBIT

# 3

FEB 16 2010

**Nos. 08-1498 and 09-89**

# In the Supreme Court of the United States

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

HUMANITARIAN LAW PROJECT, ET AL.

HUMANITARIAN LAW PROJECT, ET AL.,
CROSS-PETITIONERS

*v.*

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

*ON WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**REPLY BRIEF FOR THE RESPONDENTS**

ELENA KAGAN
*Solicitor General
Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
(202) 514-2217
SupremeCtBriefs@usdoj.gov*

Blank Page

## TABLE OF CONTENTS

Page

I.   The material-support statute's restrictions on
     providing aid to known terrorist organizations do
     not violate the Fifth Amendment ................... 1
     A.   The court of appeals confused the vagueness
          and overbreadth doctrines ................... 1
     B.   The statute's terms are sufficiently clear to
          provide notice to persons of ordinary
          intelligence ............................... 3
          1.   Instructing the PKK and LTTE on how
               to engage in international political
               advocacy constitutes "training" ............. 6
          2.   Consulting with the PKK and LTTE on
               international law, medical care, and
               economic development constitutes
               "expert advice or assistance" .............. 13
          3.   Providing persons to work under the
               direction or control of the PKK and
               LTTE constitutes "personnel" ............. 17
          4.   Helping the PKK and LTTE appear
               before national and international
               representative bodies constitutes
               "services" ............................. 22
II.  The material-support statute's restrictions on providing
     aid to known terrorist organizations
     do not violate the First Amendment ............... 26
     A.   The statute is a regulation of conduct that
          only incidentally and permissibly affects
          expression ............................... 27
          1.   As a facially neutral regulation of
               conduct, Section 2339B may impose an
               incidental burden on speech .............. 27

II

Table of Contents—Continued:    Page

    2.   Section 2339B is not a content-based
        restriction on speech ...................... 33
    3.   Section 2339B is narrowly tailored to
        advance the important governmental
        interest in preventing aid to terrorists ...... 35
  B.  The statute does not infringe petitioners' right
      of association ............................... 38
III.   The material-support statute's restrictions on providing
    aid do not require specific intent to further the terrorist
    organization's unlawful activities .................. 42

**TABLE OF AUTHORITIES**

Cases:

*Abood* v. *Detroit Bd. of Educ.*, 431 U.S 209 (1977) ..... 14
*American Commc'ns Ass'n* v. *Douds*, 339 U.S. 382
  (1950) ......................................... 13
*Blakely* v. *Washington*, 542 U.S. 296 (2004) ............. 9
*Boim* v. *Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008), cert. denied, 130 S. Ct.
  458 (2009) ...................................... 30
*City Council of L.A.* v. *Taxpayers for Vincent*,
  466 U.S. 789 (1984) ............................. 28
*City of L.A.* v. *Alameda Books, Inc.*, 535 U.S. 425
  (2002) ......................................... 33
*Clark* v. *Community for Creative Non-Violence*,
  468 U.S. 288 (1984) .......................... 29, 35
*Clark* v. *Martinez*, 543 U.S. 371 (2005) ............ 43, 44
*Cohen* v. *California*, 403 U.S. 15 (1971) ............... 32
*Connally* v. *General Constr. Co.*, 269 U.S. 385 (1926) .. 6, 16

III

Cases—Continued:                                    Page

*Cox* v. *Louisiana*, 379 U.S. 536 (1965) .................. 2

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981) ......... 41

*De Jonge* v. *Oregon*, 299 U.S. 353 (1937) ............ 39, 40

*Fisher* v. *City of Berkeley*, 475 U.S. 260 (1986) ......... 19

*Gentile* v. *State Bar*, 501 U.S. 1030 (1991) .......... 12, 13

*Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490
   (1949) ........................................ 32

*Grayned* v. *City of Rockford*, 408 U.S. 104 (1972) .. 9, 24, 25

*Haig* v. *Agee*, 453 U.S. 280 (1981) ..................... 37

*Harris* v. *United States*, 536 U.S. 545 (2002) ........... 25

*Hill* v. *Colorado*, 530 U.S. 703 (2000) ............... 5, 33

*Humanitarian Law Project* v. *Reno*,
   205 F.3d 1130 (9th Cir. 2000), cert. denied,
   532 U.S. 904 (2001) ..................... 37, 38, 39

*Humanitarian Law Project* v. *United States*
   *Dep't of Justice*, 352 F.3d 382 (2003) ............... 9

*Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525
   (2001) ...................................... 28, 29

*NAACP* v. *Button*, 371 U.S. 415 (1963) ..................

*Nixon* v. *Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) .... 29

*Northwest Austin Mun. Util. Dist. No. One* v.
   *Holder*, 129 S. Ct. 2504 (2009) ..................... 26

*Pierce* v. *Underwood*, 487 U.S. 552 (1988) .......... 11, 12

*R.A.V.* v. *City of St. Paul*, 505 U.S. 377 (1992) ....... 28, 31

*Regan* v. *Wald*, 468 U.S. 222 (1984) ............. 37, 40, 41

*Reno* v. *ACLU*, 521 U.S. 844 (1997) .................. 13

*Rumsfeld* v. *Forum for Academic & Institutional
   Rights, Inc.*, 547 U.S. 47 (2006) ................. 31, 32

IV

Cases—Continued:                                        Page

*Scales* v. *United States*, 367 U.S. 203 (1961) . . . . . . . . . 10, 11

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004)  . . . . . . . . . 42

*Smith* v. *Goguen*, 415 U.S. 566 (1974) . . . . . . . . . . . . . . . 3, 4

*Texas* v. *Johnson*, 491 U.S. 397 (1989)  . . . . . . . . . . . . . . 4, 30

*Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180
    (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 36

*Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622
    (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 36

*United States* v. *Albertini*, 472 U.S. 675
    (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34, 35, 44

*United States* v. *Eichman*, 496 U.S. 310 (1990) . . . . . . . . . 36

*United States ex rel. the Att'y Gen. of the United
    States* v. *Delaware & Hudson Co.*, 213 U.S. 366
    (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *O'Brien*, 391 U.S. 367 (1968) . . . . . . . 27, 37

*United States* v. *Ramsey*, 431 U.S. 606 (1977) . . . . . . . . . . 40

*United States* v. *Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Williams*, 128 S. Ct. 1830
    (2008) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 16, 18, 19, 25

*Veterans & Reservists for Peace in Vietnam* v.
    *Regional Comm'r of Customs*, 459 F.2d 676 (3d
    Cir.), cert. denied, 409 U.S. 933 (1972) . . . . . . . . . . . . . . 40

*Village of Hoffman Estates* v. *Flipside, Hoffman
    Estates, Inc.*, 455 U.S. 489 (1982) . . . . . . . . . . . 2, 4, 18, 24

*Virginia* v. *Hicks*, 539 U.S. 113 (2003) . . . . . . . . . . . . . . . . 26

*Ward* v. *Rock Against Racism*, 491 U.S. 781 (1989) . . . . . 29

*Wayte* v. *United States*, 470 U.S. 598 (1985) . . . . . . . . . . . 28

V

Cases—Continued:                                                    Page

   *Zemel* v. *Rusk*, 381 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . 40, 41

   *Zicarelli* v. *New Jersey State Comm'n of
     Investigation*, 406 U.S. 472 (1972) . . . . . . . . . . . . . . . . . . 6

Constitution, statutes and rule:

   U.S. Const.:

     Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

     Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 20, 40, 42

       Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   Antiterrorism and Effective Death Penalty Act of
     1996, Pub. L. No. 104-132, § 301(a)(7), 110 Stat.
     1247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   Equal Access to Justice Act, 28 U.S.C.
     2412(d)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   Intelligence Reform and Terrorism Prevention Act of
     2004, Pub. L. No. 108-458, § 6603(c), 118 Stat. 3762 . . . . 9

   Smith Act, 18 U.S.C. 2385 . . . . . . . . . . . . . . . . . . . . . . . . . 10

   8 U.S.C. 175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   8 U.S.C. 1182(a)(3)(B)(iv)(VI) . . . . . . . . . . . . . . . . . . . . . . . . 8

   18 U.S.C. 175b(d)(2)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   18 U.S.C. 225(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   18 U.S.C. 951(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

   18 U.S.C. 1169(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   18 U.S.C. 1960(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   18 U.S.C. 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

   18 U.S.C. 2339A(b)(1) . . . . . . . . . . . . . . . . . . . . . . . 4, 17, 23, 34

   18 U.S.C. 2339A(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

   18 U.S.C. 2339A(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI

Statutes and rule—Continued:                                    Page

    18 U.S.C. 2339B  .............................. *passim*
    18 U.S.C. 2339B(a)(1) ........................... 4, 20, 23
    18 U.S.C. 2339B(h) ............................ 18, 19, 21
    18 U.S.C. 2339C  .................................. 44
    Fed. R. Evid. 702  ................................. 15

Miscellaneous:

    H.R. Rep. No. 383, 104th Cong., 1st Sess.
        (1995) .................................... 30, 33, 36
    Restatement (Second) of Agency (1958) ............... 21
    *Webster's Third New International Dictionary*
        *of the English Language* (1993)  ............. 15, 16, 22

# In the Supreme Court of the United States

---

No. 08-1498

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

HUMANITARIAN LAW PROJECT, ET AL.

---

No. 09-89

HUMANITARIAN LAW PROJECT, ET AL.,
CROSS-PETITIONERS

*v.*

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

---

*ON WRITS OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

---

**REPLY BRIEF FOR THE RESPONDENTS**

---

## I. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID TO KNOWN TERRORIST ORGANIZATIONS DO NOT VIOLATE THE FIFTH AMENDMENT

### A. The Court Of Appeals Confused The Vagueness And Overbreadth Doctrines

Petitioners make virtually no effort to defend the rationale on which the court of appeals rested its decision—namely, that the challenged terms are vague be-

(1)

2

cause they can "be read to encompass speech and advocacy protected by the First Amendment." Pet. App. 22a; see *id.* at 24a, 25a. That rationale conflates two distinct constitutional doctrines: vagueness and overbreadth. Gov't Br. 42-43; see *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 n.9 (1982) (*Village of Hoffman Estates*). Vagueness doctrine asks whether, for purposes of the Fifth Amendment, the contested terms in the material-support statute have a clear meaning to an ordinary person. Overbreadth doctrine asks whether, for purposes of the First Amendment, those terms reach an impermissible amount of constitutionally protected expression. The court below wrongly collapsed those separate inquiries.

The single sentence that petitioners devote to defending the court of appeals' reasoning asserts that this Court has "link[ed] * * * the doctrines when vague statutes implicate speech." Reply Br. 19. But this Court has linked the doctrines when a plaintiff challenges a statute as both facially vague and overbroad—*i.e.*, when a plaintiff "argue[s] that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *United States* v. *Williams*, 128 S. Ct. 1830, 1845 (2008); see *Village of Hoffman Estates*, 455 U.S. at 489, 494-495, 498 & n.6; *Cox* v. *Louisiana*, 379 U.S. 536, 551-552 (1965). That linkage cannot explain the confusion in the court of appeals' analysis, because the court held that "[t]he issue of a facial vagueness challenge" was not presented. Pet. App. 22a n.6. With that issue not in play, the court should have assessed whether the material-support statute is vague as applied to petitioners' proposed conduct, and then assessed whether the statute is overbroad on its face. In any event, the court did not find, nor could it have found,

3

that the vagueness it saw in the statute rendered the statute substantially overbroad.  As petitioners' passing defense of the rationale of the decision below implicitly suggests, that rationale conflicts with this Court's precedents.  Reversal is warranted for that reason.

### B.  The Statute's Terms Are Sufficiently Clear To Provide Notice To Persons Of Ordinary Intelligence

Implicitly conceding the weakness of the court of appeals' core rationale, petitioners ask for affirmance on a ground barely noted and still less defended in the decision below:  that the material-support statute's terms do not provide sufficient notice to ordinary persons of what conduct violates the law.  See Reply Br. 4-19.  But that basis for the decision is no better than the one on which the court of appeals principally relied.  The terms of the material-support statute, when given their ordinary meaning, clearly cover petitioners' proposed activities: there is nothing vague and nothing uncertain about how the statute applies to the assistance that petitioners wish to give terrorist organizations.  As a result, even though petitioners raise only an as-applied challenge to the statute, they say almost nothing about their own proposed conduct.  They instead level against the statute a number of facial attacks, which are irrelevant to their claim and, in any event, mistaken on the merits.  Before turning to the clarity of the statute's terms as applied to petitioners' conduct, we address three errors that infect all of their analysis.

First, petitioners continue to seek a heightened standard of review, citing (Reply Br. 5) this Court's decisions in *Village of Hoffman Estates* and *Smith* v. *Goguen*, 415 U.S. 566 (1974).  But neither those cases nor any other case has suggested that a generally appli-

4

cable, content-neutral statute regulating conduct is subject to a special, heightened vagueness standard whenever any of its applications potentially reaches expressive activity. *Goguen* involved a flag-desecration statute whose terms suggested a governmental interest in suppressing a particular message. *Id.* at 575-576; *Texas* v. *Johnson*, 491 U.S. 397, 411 (1989). And in *Village of Hoffman Estates*, the Court did not apply a heightened First Amendment standard of review; rather, it held that the ordinance at issue received at most the scrutiny appropriate for criminal laws regulating conduct, notwithstanding that the entity subject to the law alleged that the law incidentally restricted its expression. 455 U.S. at 496, 499-500.

Even assuming, however, that some heightened standard might otherwise apply, "the Court has recognized that a scienter requirement may mitigate" any need for greater legislative precision. *Village of Hoffman Estates*, 455 U.S. at 499. Petitioners argue (Reply Br. 6) that the material-support statute's express scienter requirement does not qualify under this well-settled law, because the defendant does not have to know that his aid qualifies as "material support or resources," 18 U.S.C. 2339A(b)(1); he only has to know that his aid is directed toward a "foreign terrorist organization," 18 U.S.C. 2339B(a)(1). But petitioners cite no precedent suggesting that scienter must go to each and every element of the offense. Here, Congress mitigated doubt about the scope of the statute by requiring scienter for a particularly important element, ensuring that the statute would extend only to persons who provide aid to groups that they know to be terrorist. That requirement provides substantial "notice to the complainant that his conduct is proscribed," *Village of Hoffman Estates*, 455 U.S. at

5

499, and thus forecloses any need for a heightened standard of review.

Second, petitioners suggest (Reply Br. 18) that their vagueness challenge is facial rather than as-applied. That suggestion, however, conflicts with the history of this litigation. The court of appeals held that petitioners had presented only an as-applied, and not a facial, vagueness challenge. Pet. App. 22a n.6. Petitioners agreed with that holding at the certiorari stage. See Br. in Opp. 17; Cross-Pet. 3 n.2 ("[R]espondents seek to enjoin these [challenged] provisions only with respect to their proposed speech activities."). In their opening brief to this Court, petitioners stressed that they challenge the vagueness of the statute only as applied to their particular conduct. See Pet. Br. 4, 25. Petitioners now attempt (Reply Br. 18) to cast their *vagueness* challenge as facial by pointing to their assertion of an *overbreadth* challenge. But petitioners' overbreadth challenge is necessarily facial; there is no such thing as an as-applied overbreadth challenge. That says nothing about the nature of their vagueness challenge, which they have repeatedly presented as as-applied. And even assuming that petitioners had presented a facial vagueness claim, it would fail for the same reasons as their overbreadth claim:  the material-support statute is clear in the vast majority of its intended applications. See p. 26, *infra*; see also *Hill* v. *Colorado*, 530 U.S. 703, 733 (2000).

Third, petitioners attempt to dismiss (Reply Br. 6-7) their own use, to describe their own conduct, of the very words and phrases that they claim an ordinary person could not understand. They maintain that "[t]he fact that a term is used as a general descriptive matter in the English language" does not mean that it is "a permissi-

6

ble basis for criminalizing speech." *Id.* at 6. To the contrary, that is precisely what it means for vagueness purposes (putting aside any independent First Amendment argument). If the challenged terms were clear enough to petitioners "as a general descriptive matter in the English language," then a person of ordinary intelligence would understand the statute's use of those terms. See *Zicarelli* v. *New Jersey State Comm'n of Investigation*, 406 U.S. 472, 476-477 (1972) ("The term 'responsive' in ordinary English usage has a well-recognized meaning. It is not * * * 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'") (quoting *Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 (1926)). Petitioners' own pleadings betray them; in choosing, to describe their proposed conduct, the selfsame language Congress chose to describe the prohibited conduct, petitioners acknowledge that the statute is not vague.

### 1. *Instructing the PKK and LTTE on how to engage in international political advocacy constitutes "training"*

a. Petitioners' response is most interesting for what it does *not* say with respect to the term "training." Petitioners barely discuss their own proposed activities; and when they do, they cast those activities in the broadest possible terms, such as "teaching people to advocate for peace and human rights" and "human rights instruction." Reply Br. 8-9. That is because, if petitioners were to say anything more concrete about their proposed activities, they would trip over the word "training" at every turn. The record reveals that such stumbling is what occurred below: petitioners understood their conduct as "training," and said so. Petitioners' complaint

7

thus repeatedly referred to their proposed activities as
"training." See Gov't Br. 21. And at oral argument be-
fore the en banc court of appeals, their counsel twice
referred to the "human rights advocacy training" that
petitioners hope to provide. *Id.* at 26. Notably, petition-
ers are silent as to why an ordinary person would not
share their own ready understanding of the term "train-
ing" as applied to their activities.

Nor should petitioners' newly generalized descrip-
tions obscure the nature of their specific conduct. For
example, petitioners alleged in their complaint that, in
the past, "Judge Fertig and other HLP representatives
have provided training to some members of the PKK
and other Kurds on how to present their human rights
claims before the U.N. and other public-policy making
bodies, including the United States Congress." J.A. 58.
And in the future, the complaint goes on to say, "[t]he
HLP and Judge Fertig would like to * * * advis[e]
Kurds and Kurdish groups on recent developments in
international human rights law, the procedures for seek-
ing review by the newly established International Crimi-
nal Court, peacemaking negotiation skills, and advocacy
of the rights of Kurds before the Human Rights Sub-
commission of the United Nations and legislative bodies
throughout the world, including the United States Con-
gress." J.A. 59.

On any understanding of the difference between
"general knowledge" and "specific skill[s]," 18 U.S.C.
2339A(b)(2), petitioners want to impart the latter. They
want to instruct the PKK and LTTE on how to appear,
lobby, or petition before bodies like Congress, the Inter-
national Criminal Court, and the Human Rights Sub-
commission of the United Nations. That activity—
methods of engaging national and international bodies

8

as to human rights claims—is not well known to members of the general public, and instruction in it requires education and experience that relatively few members of the public possess. Petitioners do not attempt to argue otherwise. See Reply Br. 7-9. The clarity of the term "training" as defined in the statute and as applied to petitioners' proposed conduct is fatal to their claim of vagueness.

b. In any event, petitioners' facial attacks on this term of the material-support statute fare no better. The term "training" ordinarily refers to instruction in a specialized skill, see Gov't Br. 19-20, and many federal statutes use the term in that manner, *id.* at 20 & n.2. Yet petitioners do not point to a single decision holding that "training"—or even any similar term—is vague. Petitioners respond (Reply Br. 9) that most of those other statutes neither define a criminal offense nor impose a penalty. Cf. 8 U.S.C. 1182(a)(3)(B)(iv)(VI) (denying admission to aliens who provide material support, including "training," to terrorists). But absent some evidence to the contrary, a term that is intelligible in other legal settings does not suddenly become unintelligible when employed in the criminal context. Although Congress attached criminal consequences to the provision of "training" to foreign terrorists, that term retains its customary and usual meaning in the material-support statute.

Even if the term "training" were not sufficiently clear standing alone, that would not assist petitioners, because as noted above, Congress elaborated the meaning of that term by reference to "specific skill[s]." After the court of appeals held in an earlier stage of this litigation that the term "training" was vague (notably, because it may "encompass[] First Amendment protected

9

activities"), *Humanitarian Law Project* v. *United States Dep't of Justice*, 352 F.3d 382, 404 (2003), Congress further defined that term in the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), Pub. L. No. 108-458, § 6603(c), 118 Stat. 3762, to mean "instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. 2339A(b)(2). Congress thereby removed any possible ambiguity in the statute, by further defining "training" to mean only instruction in a specific skill. Cf. *Blakely* v. *Washington*, 542 U.S. 296, 326 (2004) (Kennedy, J., dissenting) ("Constant, constructive discourse between our courts and our legislatures is an integral and admirable part of the constitutional design."). This Court reviews Congress's enactments for reasonable precision, see *Grayned* v. *City of Rockford*, 408 U.S. 104, 110 (1972), and Congress clarified the statute to ensure beyond peradventure that it met this standard.

Petitioners incorrectly contend that "[e]very judge to have ruled on the 'training' prohibition in this case * * * has concluded that it is fatally unclear about what speech is prohibited." Reply Br. 7. In fact, what the courts below principally concluded—albeit under the mistaken label of "vagueness" analysis—is that the material-support statute reaches some protected expression. See Pet. App. 22a, 63a. Indeed, the court of appeals specifically held that the statute was impermissibly vague "[e]ven if persons of ordinary intelligence could discern between the instruction that imparts a 'specific skill,' as opposed to one that imparts 'general knowledge,'" because "the term 'training' could still be read to encompass speech." *Id.* at 22a. In other words, the court held that the term "training" is vague,

10

even if its statutory definition is *not* vague according to the well-established constitutional test.

Moreover, Congress's distinction between a specific skill and general knowledge is not itself vague. That distinction is common to the law. Several federal statutes distinguish between the general and the specific, see Gov't Br. 23, and the Sentencing Guidelines distinguish between generalized and specialized skills, see *id.* at 22 n.3. Petitioners do not say whether, on their view, each of those provisions would be subject to a potential vagueness challenge. They argue that similar statutes and the Sentencing Guidelines "do[] not separate criminal from non-criminal conduct." Reply Br. 9 n.2. But the response seems not to the point, which is that in all contexts (criminal and noncriminal alike) legislators and judges routinely depend on and apply a "general-specific distinction." *Id.* at 7. Its prevalence in the law, and the apparent ease with which it is applied, belies any contention that the distinction is "inescapably subjective." *Ibid.* After all, the vagueness inquiry turns not on how often Congress has used that distinction in defining criminal offenses, but on whether the distinction between imparting specific skills and imparting general knowledge is readily intelligible to the average person. The frequency of the distinction's appearance in the United States Code, as well as in ordinary language, answers that question.[1]

---

[1] This Court has recognized that a statute is not vague merely because it might be characterized as involving a distinction of degree. Pet. Br. 27. In *Scales* v. *United States*, 367 U.S. 203 (1961), this Court interpreted the Smith Act, 18 U.S.C. 2385, to require active membership in certain organizations. It then rejected a vagueness challenge to the statute, holding that "[t]he distinction between 'active' and 'nominal' membership is well understood in common parlance, and the point at

11

Petitioners also incorrectly argue that this Court's decision in *Pierce* v. *Underwood*, 487 U.S. 552 (1988), "underscores the terms' ambiguity." Reply Br. 8. *Pierce* concerned a provision of the Equal Access to Justice Act (EAJA), 28 U.S.C. 2412(d)(2)(A)(ii), authorizing increased attorney fees for "a special factor, such as the limited availability of qualified attorneys for the proceedings involved." In light of that language, the Court held that increased fees were available only for "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation." *Pierce*, 487 U.S. at 572. Notably, the Court foresaw no difficulty in distinguishing between attorneys with specialized skills (like those who practice in the fields of intellectual property or foreign law, see *ibid.*) and attorneys with more general legal knowledge.

Petitioners contend that "[j]udicial determination of attorney compensation is a far cry from criminalizing speech." Reply Br. 8. Like the courts below, petitioners conflate their substantive challenges under the First Amendment with their vagueness challenge under the Fifth Amendment. *Pierce* demonstrates that the distinction between specialized skills and general knowledge is capable of clear application to a particular context; it is a separate question whether the statutory term defined by that distinction, as applied to petition-

---

which one shades into the other is something that goes not to the sufficiency of the statute, but to the adequacy of the trial court's guidance to the jury by way of instructions in a particular case." *Scales*, 367 U.S. at 223 (internal citations omitted).

12

ers' conduct, runs afoul of the First Amendment.[2] The former goes to whether a statute is clear, while the latter goes to whether a clear statute is otherwise permissible. For purposes of vagueness doctrine, the critical point is that neither Congress, nor the Sentencing Commission, nor this Court, nor other courts have struggled to understand or apply the distinction between specific skills and general knowledge in any context. That distinction is no more difficult to understand or apply as it appears in the material-support statute.

For the proposition that the distinction between general knowledge and specific skills is "inescapably subjective," petitioners continue to rely (Reply Br. 7-8) solely on *Gentile* v. *State Bar*, 501 U.S. 1030 (1991). As the government previously explained, that decision is inapposite. See Gov't Br. 23-24. The state ethics rule at issue in *Gentile* prevented attorneys from "elaborat-[ing]" on "the general nature of the claim or defense," 501 U.S. at 1048, and thereby demanded a subjective judgment about how much attorney speech is too much. Nothing of the kind is involved in the material-support statute. The term "training" requires an objective determination that the defendant's instruction was de-

---

[2] Petitioners argue that under "the EAJA standard" their "proposed human rights instruction" involves general knowledge rather than specialized skill. Reply Br. 8-9. That is false: very few attorneys are capable of teaching others how to appear, lobby, or petition before governmental bodies on matters relating to international and human rights law. Indeed, the Court in *Pierce* specifically cited foreign law as the kind of subject matter requiring specialized knowledge. 487 U.S. at 572. In any event, applying the distinction between specialized skills and general knowledge depends in part on context. Unlike the EAJA, the material-support statute asks whether an ordinary citizen (not an attorney) is imparting to foreign terrorists (not legal clients) skills that are specialized vis-à-vis the general public (not the legal profession).

13

signed to impart a specific skill, not generally possessed by the public. Whether members of the public generally possess a skill "is a true-or-false determination, not a subjective judgment." *Williams*, 128 S. Ct. 1846. To be sure, "it may be difficult in some cases to determine" whether instruction is designed to impart such a skill, but "courts and juries every day pass upon" exactly that type of factual question. *Ibid.* (quoting *American Commc'ns Ass'n* v. *Douds*, 339 U.S. 382, 411 (1950)). And, unlike the rule in *Gentile*, the material-support statute contains a scienter requirement, which diminishes any residual danger that a person might inadvertently train foreign terrorists in specific skills. See 501 U.S. at 1049-1050.[3]

### 2. Consulting with the PKK and LTTE on international law, medical care, and economic development constitutes "expert advice or assistance"

a.  Although their vagueness challenge is as-applied, petitioners likewise do not address how application of the term "expert advice or assistance" to their proposed conduct involves any doubt or uncertainty. In the past, "Judge Fertig, acting on behalf of the HLP, * * * has assisted members of the PKK and its political arm, the ERNK, in attempting to resolve peacefully the conflict between the Turkish government and the Kurds." J.A. 58. In the future, Judge Fertig and the HLP want to

---

[3]  The ethics rule in *Gentile* also was a content-based regulation of speech—*i.e.*, "a ban on political speech critical of the government and its officials." 501 U.S. at 1034. Such a regulation "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno* v. *ACLU*, 521 U.S. 844, 871-872 (1997). By contrast, the material-support statute is a generally applicable, content-neutral regulation of conduct. See pp. 27-34, *infra*.

14

continue to "assist PKK members at peace conferences and other meetings designed to support a peaceful resolution of the Turkish conflict." J.A. 59; see Pet. Br. 10. Other petitioners want to aid the LTTE by providing "expert medical advice and assistance," J.A. 60; "expert advice on how to improve the delivery of health care, with a special focus on the area of otolaryngology," J.A. 61; and "expert advice and assistance" "in the fields of politics, law, and economic development," *ibid.*, as well as "information technology," J.A. 62.

It is unsurprising that all of the petitioners describe their proposed activities as "expert" in nature. International peace negotiators, medical doctors, development economists, and software programmers are commonly thought of as experts. Cf. *Abood* v. *Detroit Bd. of Educ.*, 431 U.S. 209, 221-222 (1977) (noting that the negotiation of a collective-bargaining agreement may require the services of "expert negotiators"). Even without further explanation, the term "expert" is as ordinary and as readily understood as the vast majority of words found in federal (including criminal) statutes; and that term obviously applies to petitioners' conduct. But Congress removed any doubt about the meaning of that term by defining "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge." 18 U.S.C. 2339A(b)(3). Petitioners do not attempt to argue with any particularity that the types of assistance they enumerate in their complaint do not "derive[] from scientific, technical or other specialized knowledge." Because that definition clearly covers petitioners' proposed activities, their as-applied vagueness challenge must fail.

b.  In any event, petitioners cannot demonstrate that the phrase "scientific, technical or other specialized

15

knowledge" is unconstitutionally vague as applied to conduct generally. Petitioners do not directly respond to the government's argument that the terms "scientific" and "technical" have objective and readily understood meanings. Gov't Br. 31 ("[T]he use of terms like 'scientific' and 'technical' rests on factual determinations— *i.e.*, whether knowledge is specific, practical, and related to a particular branch of science or a profession.") (quoting *Webster's Third New International Dictionary of the English Language* 2348 (1993) (*Webster's*)). Nor do petitioners respond to the government's argument (Br. 30) that, under the principle of *ejusdem generis*, the term "specialized knowledge" takes it meaning from the preceding terms "scientific" and "technical." Under that commonly employed concept (even if uncommonly used label), an ordinary person would understand the entire phrase to mean knowledge relating to subject matter and based on experiences not commonly possessed or shared by the general public.

Because Congress drew the phrase "scientific, technical, or other specialized knowledge" from Federal Rule of Evidence 702, petitioners argue (Reply Br. 10) that the phrase's meaning is apparent only to judges, not ordinary citizens. But in interpreting Rule 702, this Court has looked to the ordinary meaning of the rule's words, see Gov't Br. 29-30, and petitioners do not contend otherwise. Moreover, even assuming (what is self-evidently not true) that the phrase "scientific, technical or other specialized knowledge" had a determinate meaning only in the legal context, that would not assist petitioners. In assessing the clarity of federal statutes, courts have long looked to whether Congress "employed words or phrases having a technical or other special meaning, * * * or a well-settled common-law meaning,

16

notwithstanding an element of degree in the definition as to which estimates might differ." *Connally*, 269 U.S. at 391; see *Williams*, 128 S. Ct. at 1846 ("[W]e have struck down statutes that tied criminal culpability to * * * wholly subjective judgments *without* statutory definitions, narrowing context, or *settled legal meanings*.") (emphasis added).

Petitioners no longer argue that all knowledge is derived from scientific, technical, or other specialized knowledge. See Pet. Br. 29-30. Rather, they now assert that the phrase "derived from" is itself "too indeterminate" to provide sufficient notice to an average person. Reply Br. 10. But there is no difficulty in applying that phrase to this case. Petitioners want to impart skills that they developed as a result of their substantial education and experience in law, medicine, and technology. See *Webster's* 608 (defining "derived" as "formed or developed out of something else"). The connection between petitioners' specialized knowledge and the expert assistance they seek to render is obvious and unattenuated. And petitioners offer no ground or evidence to think that the phrase "derived from" will be less clear as to some other set of persons involved in different activities. Suggestive of the opposite is the use of the identical phrase several hundred times in the United States Code. Petitioners say nothing about which of those other provisions are, on their view, also unconstitutional.

Petitioners contend (Reply Br. 10-11) that the distinction between types of general knowledge (like geography) and types of specialized knowledge (like geoscience or geopolitics) is "fundamentally indeterminate." *Id.* at 11. But a reasonable person contemplating assistance to foreign terrorists understands the differ-

17

ence between subjects that require substantial education or experience and subjects that do not. Indeed, petitioners' own example proves the point as well as any other. It does not require specialized knowledge to inform the LTTE's members of what presumably they and many others already know: Sri Lanka is an island nation located off the southern coast of India (geography). Yet it would require specialized knowledge to inform them of what they and others will not commonly know, such as, for instance, whether and where Sri Lanka contains large deposits of mineral ores (geoscience) or how European colonization has affected the country's current government (geopolitics). A person instructing members of the LTTE on how to develop natural resources or capitalize on nationalist trends is offering exactly the type of "expert advice or assistance" that Congress targeted in the material-support statute.[4]

### 3. *Providing persons to work under the direction or control of the PKK and LTTE constitutes "personnel"*

a. In their discussion of the term "personnel," petitioners again say nothing at all about their proposed activities. Among other things, petitioners seek to "engage in political advocacy on behalf of the PKK and the Kurds before the U.N. Commission on Human Rights and the United States Congress; * * * and * * * as-

---

[4] Petitioners claim that the types of aid prohibited by the material-support statute—such as "false documentation or identification, communications equipment, * * * weapons, lethal substances, [and] explosives," 18 U.S.C. 2339A(b)(1)—suggest that the statute "forbids only advice that furthers a group's violent ends." Reply Br. 11. But the statute also prohibits the provision of many other types of aid—including "currency or monetary instruments or financial securities, financial services, lodging," "facilities," and "transportation," 18 U.S.C. 2339A(b)(1)—which need not be used to further a group's violent ends.

18

sist PKK members at peace conferences and other meetings." J.A. 58-59. As amended by Congress in IRTPA, the term "personnel" requires that a defendant knowingly provide one or more persons "to work under" a foreign terrorist organization's "direction or control" or "to organize, manage, supervise, or otherwise direct the operation of that organization." 18 U.S.C. 2339B(h). By contrast, the statute exempts any individual "who act[s] entirely independently of the foreign terrorist organization to advance its goals or objectives." *Ibid.* Petitioners do not attempt to argue that their intended conduct, coordinated as it is with the PKK and LTTE, does not fall within the statutory definition of "personnel."

b. Petitioners' "principal vagueness objection" is that between action taken under a foreign terrorist organization's direction or control and action taken independently of that organization, there is a "vast gray area" that creates uncertainty "as to what is permissible." Reply Br. 15. That claim—*i.e.*, that the scope of the statute is so unclear that persons who want to assist known foreign terrorists cannot know what forms of aid generally are prohibited—is the essence of a facial, not as-applied, vagueness challenge. See *Williams*, 128 S. Ct. at 1845; *Village of Hoffman Estates*, 455 U.S. at 494-495, 497-498.

In any event, the question whether a defendant has acted "under [a] terrorist organization's direction or control" is simply a factual issue to be resolved by the jury in a particular case. 18 U.S.C. 2339B(h). That question may be close in some circumstances, but the possibility of hard cases does not render the term "personnel" vague. As this Court reasoned in *Williams*, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether

19

the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." 128 S. Ct. at 1846. Nothing about the facts to be established under the "personnel" provision is indeterminate.

Contrary to petitioner's claim (Reply Br. 15-17), the government has not argued that the material-support statute somehow incorporates antitrust doctrine. Section 2339B(h) requires a particular type of concerted action: "work under [a] terrorist organization's direction or control." The government has never contended that this statutory requirement mirrors the Sherman Act, and petitioners' extended discussion of this comparison is therefore beside the point. What the government has argued, and what goes unrebutted by petitioners, is that a number of federal statutes rely in some manner on the distinction between action taken independently and action taken in concert with another. Accordingly, "[j]ust as, for instance, an ordinary person understands the difference between 'concerted effort by more than one entity to fix prices or otherwise restrain trade' and 'independent activity by a single entity,' *Fisher* v. *City of Berkeley*, 475 U.S. 260, 266 (1986), so too he will understand the difference between acting under a foreign terrorist organization's 'direction or control' and acting on his own." Gov't Br. 35.

Indeed, quite apart from antitrust law, the definition of "personnel" is similar to terms used in other federal statutes that impose criminal liability on persons who either act under another's direction or control, see, *e.g.*, 18 U.S.C. 175b(d)(2)(G); 18 U.S.C. 951(d), or manage, supervise, or organize an operation or individual, see, *e.g.*, 18 U.S.C. 225(a)(1); 18 U.S.C. 1169(b)(1); 18 U.S.C. 1960(a). Petitioners argue that "[n]one of the cited statutes threatens to criminalize otherwise-protected First

20

Amendment activity based solely on varying levels of coordination with a designated group." Reply Br. 17. But again, petitioners conflate their First and Fifth Amendment challenges. The question for vagueness purposes is not whether the First Amendment permits the criminalization of conduct (or, as petitioners would have it, expressive activity) that occurs in coordination with known foreign terrorists. Rather, the relevant question is whether the concept of coordination is too indeterminate to provide the basis for criminal liability. As numerous federal statutes demonstrate, the answer is no.

Two of these federal criminal statutes impose liability on persons who act under "the direction or control" of another. See 18 U.S.C. 175b(d)(2)(G) (prohibiting the possession, shipment, or transportation of certain biological agents by "an individual who * * * operates subject to the direction or control of" a foreign government designated by the Secretary of State as supporting terrorism); 18 U.S.C. 951(d) (requiring notification to the Attorney General by certain "individual[s] who agree[] to operate within the United States subject to the direction or control of a foreign government or official"). Petitioners attempt in vain to distinguish those statutes.

With respect to Section 175, petitioners contend that "[t]he underlying prohibition on possessing biological agents has no nexus to protected speech, and thus need not satisfy heightened vagueness standards." Reply Br. 17 n.7. But Section 2339B(a)(1) also lacks any nexus to speech, prohibiting as it does the provision of material support and resources, including personnel, to known foreign terrorists. In any event, both Section 175 and the personnel provision here require, in order to estab-

21

lish the prohibited underlying conduct, a factual determination about whether an individual operates subject to "the direction or control" of a foreign entity. Petitioners never explain why raising the standard of review for the personnel provision would suddenly render that factual determination impossible.

With respect to Section 951, petitioners assert that it "invokes a traditional agency relationship." Reply Br. 18 n.7. But in specifically defining the phrase "agent of a foreign government," Section 951 chooses not merely to incorporate or rely on traditional agency principles. See Restatement (Second) of Agency § 1 (1958). Instead, it defines an "agent" as an "individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. 951(d). Once again, petitioners offer no explanation for why the same statutory phrase—"direction or control"—is clear in the context of Section 951(d) but indeterminate in the context of Section 2339B(h).

Finally, petitioners do not dispute that both before and after IRTPA's enactment, courts have consistently upheld the term "personnel" against vagueness challenges. See Gov't Br. 35-36. Petitioners claim that those cases did not involve "the type of loosely coordinated speech" in which they seek to engage. Reply Br. 18 n.7. But it is hard to see from the face of petitioners' complaint where this "looseness" resides; the activities mentioned there disclose direct and substantial connections to terrorist organizations. See J.A. 58-59. And as discussed above, petitioners have provided no further detail about their intended conduct before this Court. If petitioners' conduct will not occur under the "direction or control" of the PKK and LTTE, they have no reason to seek an injunction against enforcement of the term "per-

22

sonnel"; and if their conduct will occur under the "direction or control" of the PKK and LTTE, they have no basis for such an injunction.

### 4. Helping the PKK and LTTE appear before national and international representative bodies constitutes "services"

a. Petitioners do not attempt to explain why the term "service" is unclear as applied to their proposed conduct. No doubt that is because, although their hypotheticals suggest otherwise (Reply Br. 14), petitioners seek to render direct benefit to the PKK and LTTE by assisting in the actions that those groups undertake. Petitioners seek to "assist[] the PKK in appearing before national and international representative bodies such as the United Nations Human Rights Subcommission, the Council of Europe, the United States Congress, and international human rights conferences." J.A. 98. In particular, they seek "to provide training and expert advice and assistance * * * on how to bring claims and appeals of Kurds before the UN and other policy making bodies." J.A. 99. Petitioners' proposed conduct therefore falls squarely within the term "service" on any interpretation.

b. Petitioners contend that, as evidence of the term's ambiguity, "the government offers three dramatically different definitions" of "service." Reply Br. 12. That is not the case. See Gov't Br. 38-41. The government's principal position is that the term "service" refers to "an act done for the benefit or at the command of another." *Webster's* 2075; see Gov't Br. 38. Under this definition, the terrorist organization's command or behest is not a necessary element; petitioners themselves suggest that Congress intended to prohibit services "such as survey-

23

ing and mapping a target site" that are provided to foreign terrorist organizations, even if not at their behest or command. Reply Br. 13. In light of the statute's purposes, Congress surely employed the term "service," consistent with its ordinary meaning, to refer to an act done for the benefit of a foreign terrorist organization. That definition fits well with the statute's additional requirement that the "service" be provided *"to* a foreign terrorist organization." 18 U.S.C. 2339B(a)(1) (emphasis added). Because of that requirement, it is not sufficient for a defendant, acting independently of a foreign terrorist organization, to perform an act that may in fact benefit that organization. Rather, the defendant must channel the intended benefit toward that organization.[5]

Petitioners incorrectly assert that the phrase "service to" is not limited to aid directed toward a foreign terrorist group, because "[i]ndependently acting to benefit someone is not uncommonly labeled rendering a service to him." Reply Br. 14. In fact, it would be unusual to say that someone who, on his own, performs an act that indirectly benefits the PKK and LTTE has rendered a type of "material support or resources"—*i.e.*, a "service"—"to" those groups. And petitioners' reading becomes all the more implausible when the word "service" is viewed in context. Section 2339A(b)(1) forbids providing a number of types of support to foreign terrorist organizations, from "currency" and "financial ser-

---

[5] Contrary to petitioners' argument (Reply Br. 14 n.4), the question is not whether the defendant renders aid to a terrorist organization directly or through an intermediary, but whether the defendant targets the organization as the ultimate recipient of its intended aid. See Gov't Br. 22, 39; see also Gov't C.A. Reply Br. 8 n.1 ("[T]he statute would prohibit, for example, giving money to a terrorist group through a third-party conduit.").

24

vices" to "weapons" and "explosives." As the types of aid enumerated in the statute indicate, Congress was concerned with "service[s]" that are directed toward a foreign terrorist organization. See Gov't. Br. 39-40. Moreover, reading "service" to include independent advocacy, as petitioners suggest, would make meaningless Congress's decision to exclude such activity from the subsidiary term "personnel." "[T]he various provisions of the Act should be read *in pari materia*," *United States* v. *Riverside Bayview Homes, Inc.*, 474 U.S. 121, 138 n.11 (1985), with "service" interpreted not to encompass types of conduct—like independent advocacy—that its subsidiary terms specifically exclude. See Gov't Br. 40.[6]

Indeed, the government has taken the position throughout this litigation that independent advocacy is not covered by the term "service." See, *e.g.*, Gov't C.A. Br. 46. That consistent position is entitled to respect in evaluating whether the term "service" is unconstitutionally vague. See *Grayned*, 408 U.S. at 110 (vagueness challenge to a statute requires consideration "to some degree" of "the interpretation of the statute given by those charged with enforcing it"); cf. *Village of Hoffman Estates*, 455 U.S. at 494 n.5 ("In evaluating a facial chal-

---

[6] Contrary to petitioners' assertion (Reply Br. 13), this argument is not new. In their opening brief before the court of appeals, petitioners argued that the term "service" "is so broad that it swallows any of the limitations" contained in the other challenged terms. Pet. C.A. Br. 49-50. The government responded that "'service'—like the terms 'training' and 'expert advice or assistance'—is limited by surrounding statutory terms and context to mean support knowingly given directly to terrorist groups, and does not include independent advocacy that might indirectly benefit such organizations." Gov't C.A. Br. 46. Thus, petitioners have long been on notice that the government interprets the statutory phrase "service to" as excluding independent advocacy.

25

lenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proferred.") (citing *Grayned*, 408 U.S. at 110).

If, however, this Court finds that the government's preferred reading of "service" (as including "acts done for the benefit of another") could sweep in independent advocacy, even when combined with the word "to," then the Court should limit the term "service" to acts done at the command or behest of a foreign terrorist organization to further its goals and objectives. See Gov't Br. 40-41. Interpreted in that way, the statute could not possibly reach independent advocacy, and thus it would not, even on petitioners' approach, present a vagueness problem. "[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the Court's] duty is to adopt the latter.'" *Harris* v. *United States*, 536 U.S. 545, 555 (2002) (quoting *United States ex rel. the Att'y Gen. of the United States* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)). To the extent that the government's principal reading of "service to" raises concern, this canon of constitutional doubt permits interpretation of the statute to require that a "service" be done at a foreign terrorist organization's command or behest.

Under either approach, whether the defendant has the requisite connection with a known terrorist organization is a straightforward factual question. The government may find it harder or easier to prove that connection in a given case, but nothing about the question itself is subjective or indeterminate. See *Williams*, 128 S. Ct. at 1846. Although petitioners strain to read the term "service" (Reply Br. 14), and indeed all of the chal-

26

lenged terms (*id.* at 18-19), in a manner that would render the statute unconstitutional, the duty that this Court owes to a coordinate Branch compels a different course. See, *e.g.*, *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2513 (2009). Reasonably interpreted, the contested terms in the material-support statute all have a clear meaning to an ordinary person, and accordingly the statute is not unconstitutionally vague.

## II. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID TO KNOWN TERRORIST ORGANIZATIONS DO NOT VIOLATE THE FIRST AMENDMENT

Petitioners largely abandon (Reply Br. 18-19) their claim that the material-support statute is overbroad. They assert in passing that the four challenged terms "are so profoundly indeterminate that they are facially overbroad," *id.* at 18, but they make no effort to demonstrate that the statute prohibits a "substantial" amount of protected expression, judged both in absolute terms and in relation to the statute's legitimate applications, *Virginia* v. *Hicks*, 539 U.S. 113, 119-120 (2003). Although petitioners say (Reply Br. 18-19) that the statute interferes with the work of some of their amici, those amici do not themselves contend that the statute is overbroad. See Carter Center Amicus Br. 6, 28. In the end, petitioners offer no serious challenge (nor could they) to the court of appeals' conclusion that Section 2339B is not overbroad.

Petitioners continue to argue (Reply Br. 20-39) that Section 2339B, as applied to their proposed conduct, violates their speech and association rights. Not a single court (and indeed not a single judge on the en banc court of appeals in this case) has accepted either of those arguments. The material-support statute is a content-neu-

27

tral regulation of conduct that at most incidentally restricts petitioners' speech and association. It is therefore subject to no more than intermediate scrutiny on both claims under *United States* v. *O'Brien*, 391 U.S. 367 (1968). And, as the court of appeals held, it survives such scrutiny because it is narrowly tailored to advance important governmental interests unrelated to the suppression of expression or association.

### A.    The Statute Is A Regulation Of Conduct That Only Incidentally And Permissibly Affects Expression

#### 1.    As a facially neutral regulation of conduct, Section 2339B may impose an incidental burden on speech

a. Petitioners' challenge is defeated by two key points. See Gov't Br. 44-47. First, Section 2339B is a regulation of a type of conduct—providing aid to foreign terrorist organizations. *Id.* at 45. That prohibition on conduct applies without regard to whether the donor of the aid intends to convey a particular message or engage in expression at all. Accordingly, to the extent that Section 2339B restricts expressive activity, that restriction is incidental to a generally applicable and content-neutral ban on conduct. Second, Section 2339B's ban on providing aid to foreign terrorist groups is justified by a governmental interest that is unrelated to the suppression of expression. The statute is directly geared to preventing the flow of material aid to groups whose violent activities threaten American lives and interests. *Id.* at 45-47.

b.    Under this Court's precedents, generally applicable regulations of conduct that impose an incidental burden on expression are subject to intermediate scrutiny under *O'Brien*. See, *e.g.*, *United States* v. *Albertini*, 472 U.S. 675, 687 (1985) ("Application of a facially neutral

28

regulation that incidentally burdens speech satisfies the First Amendment" if it survives intermediate scrutiny.); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 604 (2001) (Stevens, J., concurring in part) ("This Court has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression."); *id.* at 567.

Petitioners appear to argue (Reply Br. 20-26) that the *O'Brien* test applies only when a facially neutral regulation of conduct imposes an incidental burden on acts, divorced from all words, that express a message. That argument makes clear that it is petitioners, not the government, who hope to "radically revise[]" "First Amendment doctrine." *Id.* at 26. This Court has never limited *O'Brien*'s test for incidental restraints in such a manner. To the contrary, this Court has held that intermediate scrutiny applies to content-neutral regulations of conduct that impose incidental burdens on communication, regardless whether that communication is written, oral, or (as in *O'Brien* itself) symbolic. See *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 189 (1997) (*Turner II*); *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 662 (1994) (*Turner I*); *Wayte* v. *United States*, 470 U.S. 598, 611 (1985); *City Council of L.A.* v. *Taxpayers for Vincent*, 466 U.S. 789, 804-805 (1984); see also *R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). So far as the government is aware, no member of this Court, nor any lower court, has suggested that strict scrutiny should replace the *O'Brien* test when a generally applicable, content-neutral regulation of conduct incidentally restrains expression involving words.

29

Nor do petitioners explain why the Court should limit the *O'Brien* test to cases in which the incidental restriction burdens a single form of expression—*i.e.*, nonverbal expression. The conduct at issue in *O'Brien* was indisputably communicative in nature and purpose, and this Court did not suggest that it had some lesser value because it relied on symbols. See *Reilly*, 533 U.S. at 567 (noting *O'Brien*'s application to incidental restrictions of "communicative action"); *Nixon* v. *Shrink Mo. Gov't PAC*, 528 U.S. 377, 386 (2000) (same). What matters under *O'Brien* and its progeny is not the form of a person's communication, but whether the government has regulated that communication only incidentally, as part of a general regulation that applies irrespective of the person's message.[7]

Section 2339B is just such a generally applicable regulation. What the statute prohibits is the act of providing aid to known foreign terrorist organizations in a wide variety of forms, tangible and intangible, economic and noneconomic. The statute applies regardless of a person's beliefs or motives in rendering material support to a terrorist organization. The statute applies regardless whether the support is accompanied by any expression (verbal or nonverbal) and, if it is, regardless of the content of that expression. See Pet. App. 28a. No

---

[7] In an analogous context, this Court has applied the constitutional standard for time, place, and manner regulations—which "is little, if any, different" from the *O'Brien* standard for content-neutral regulations of conduct, *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 298 (1984)—to instances of both expressive conduct, *ibid.*, and speech, *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989). Whether applied to expressive conduct or speech, this Court has upheld a time, place, or manner regulation if it is "justified without reference to the content of the regulated speech." *Ibid.* (quoting *Clark*, 468 U.S. at 293).

30

doubt the statute sometimes will sweep in expression, including words. When, for example, a person trains a terrorist organization in building bombs or flying airplanes or (as here) petitioning international bodies, words are likely to be involved. But the statute does not specially regulate expression, let alone expression of any particular kind; nor does its application depend on any particular communicative effect. Cf. *Johnson*, 491 U.S. at 411-412. Section 2339B prohibits the provision of material support to known foreign terrorists generally, and therefore is subject to intermediate scrutiny under *O'Brien*.

c. For similar reasons, petitioners cannot claim that in enacting the material-support statute, Congress's interest was "related to the suppression of free expression." *Johnson*, 491 U.S. at 403. Congress's manifest interest was to end the flow of support and resources to foreign organizations engaged in violent and unlawful activities. Congress acted on the view that all support to such organizations, even if ostensibly directed at their legal activities, abetted their terrorist aims. Cf. *Boim* v. *Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc) ("Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities."), cert. denied, 130 S. Ct. 458 (2009). "[T]he fungibility of financial resources and other types of material support" would permit individuals "to supply funds, goods, or services to an organization," which would "help[] defray the cost to the terrorist organization of running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities." H.R. Rep. No. 383, 104th Cong., 1st Sess. 81 (1995) (*1995 House Re-*

31

*port*). Nothing about that governmental interest relates in any way to the suppression of free expression.

Petitioners appear to argue (Reply Br. 22-23) that because they wish to engage in "pure speech," the government's interest in applying the material-support statute to them must relate to suppressing expression. That proposition is wrong because its premise is wrong. More is at issue here than "only words," with "no nonspeech element or noncommunicative conduct." *Id.* at 22 (internal quotation marks omitted). To the contrary, what petitioners wish to do in this case has an obvious nonspeech element: they hope to provide material support to terrorists. And application of the statute to petitioners follows exclusively from their proposed provision of such support, in the form of training, expert assistance, and personnel.

This Court has recognized often that words can have nonspeech elements or be ancillary to conduct (just as acts can have speech elements or be ancillary to expression). For example, the Court in *R.A.V.* noted that spoken words may have "unprotected features" deriving from the "'nonspeech' element of communication." 505 U.S. at 386. That is why the government has the "power to proscribe particular speech on the basis of a noncontent element (*e.g.*, noise)," although that "does not entail the power to proscribe the same speech on the basis of a content element." *Ibid.* Similarly, the Court has acknowledged that language can be but a vehicle for or adjunct to proscribable conduct. In *Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) (*FAIR*), this Court held that because "[t]he compelled speech" involved in that case was "plainly incidental to the Solomon Amendment's regulation of conduct," it did not violate the First Amendment: "it

32

has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 62 (quoting *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).[8]

That is all that is at issue here. The application of Section 2339B to petitioners reflects the government's interest not in suppressing the expression of petitioners' ideas, but in preventing material support to foreign terrorist organizations. Petitioners propose to provide tangible assistance to terrorists through the medium of language, but that does not exempt them from the force of the statute. That is because the government is targeting the nonspeech (and *a fortiori* the noncontent) element of petitioners' proposed dealings with the PKK and LTTE.[9] Nor does it matter, as petitioners seem to think, that they wish through their training and other activities to support purportedly legitimate operations of terrorist organizations. Congress determined that by imparting to the PKK and LTTE valuable skills, peti-

---

[8] In *FAIR*, this Court noted that "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62. Similarly, the Court has long recognized that statutes prohibiting such conduct as blackmail, bribery, fraud, and treason—even though all those acts are effectuated through the use of language—raise no serious First Amendment concern.

[9] It is for this reason that cases like *Cohen* v. *California*, 403 U.S. 15 (1971), are utterly inapposite. See Reply Br. 26 & n.12. In those cases, unlike in this one, the government's application of a statute arose from and targeted the content of a speaker's message or the likely communicative impact of that message on its intended audience.

33

tioners free resources, either directly or indirectly, for terrorist organizations to devote to unlawful activities. Petitioners' actions thus strengthen those groups and, in turn, endanger American lives and interests. *1995 House Report* 81. Application of Section 2339B to petitioners arises only from these legitimate governmental interests; it prevents petitioners, no matter what ideas they have or express, from providing direct support to and thereby strengthening terrorist organizations.

### 2. *Section 2339B is not a content-based restriction on speech*

a. Petitioners argue (Reply Br. 29-30) that the material-support statute's prohibitions on "training" and "expert advice or assistance" (but apparently not "personnel" and "service") are content-based. Petitioners agree (*id.* at 28), as they must, that "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *City of L.A.* v. *Alameda Books, Inc.*, 535 U.S. 425, 448 (2002). That rule resolves the question. The categories of "training" or "expert advice or assistance" do not necessarily refer to speech at all; nor do the provisions distinguishing between general knowledge and specific skills, on which petitioners seem to place greatest weight. Such prohibitions on conduct do not become content-based regulations of speech because they incidentally restrict some but not all expressive activity.[10] And even as and when

---

[10] Petitioners appear to agree (Reply Br. 29-30) that a law is not content-based simply because one must "look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill* v. *Colorado*, 530 U.S. 703, 721 (2000). Although *Hill* concerned time, place, and manner regulations, that fact

34

applied to expressive activity, the statutory terms do not distinguish based on viewpoint or subject matter or speaker or any other consideration that this Court has viewed as suspect in its First Amendment case law. The training and expert assistance prongs of Section 2339B prohibit aid to terrorist organizations—not speech and certainly not speech with any particular message.

b.  Petitioners further argue (Reply Br. 28) that the statute is content-based because it does not prohibit the provision of medicine and religious materials.  See 18 U.S.C. 2339A(b)(1).  But that limitation again has nothing to do with the content of any speaker's message. Congress was entitled to find that certain forms of assistance are not fungible, and so will not inevitably aid the activities of terrorist organizations that endanger American lives and interests.  Or Congress was entitled to determine that the humanitarian value of some forms of aid outweighs the interests supporting their prohibition. If Congress may ban the flow of material support or resources generally, then it may narrow that ban by creating exceptions, so long as the governmental interest in those exceptions—like the governmental interest in the ban itself—is unrelated to the suppression of expression.  The justification for preventing resources from flowing to terrorists becomes no less significant because Congress has determined that some resources present lesser dangers.  See *Albertini*, 472 U.S. at 687 ("That justification [for excluding the defendant] did not

---

is irrelevant.  A host of generally applicable laws regulating conduct work in the same way, such as statutes regulating discrimination or misbranding of products.  Determining whether a defendant has violated the law depends on knowing what he has said, but that does not render such laws content-based.

35

become less weighty when other persons were allowed to enter.").

### 3. Section 2339B is narrowly tailored to advance the important governmental interest in preventing aid to terrorists

a. Petitioners contend (Reply Br. 31-32) that the government must justify the material-support statute as applied to their specific conduct. But that requirement does not apply to statutes subject only to intermediate review. As this Court explained in *Albertini*, "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." 472 U.S. at 688. According to the Court, "[r]egulations that burden speech incidentally * * * must be evaluated in terms of their general effect." *Id.* at 688-689 (internal citation omitted); see *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 296-297 (1984) ("[T]he validity of this regulation need not be judged solely by reference to the demonstration at hand."). Here, the government must prove that it has a substantial interest in the material-support statute taken as a whole, not taken in each particular application. And petitioners concede that, as a general matter, the government has "legitimate interests" in Section 2339B. Reply Br. 32.

b. In any event, petitioners' argument (Reply Br. 33-35) that the government lacks a sufficiently important interest to regulate their activity does not defeat Congress's considered judgment. Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribu-

36

tion to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 301(a)(7), 110 Stat. 1247. Petitioners claim that Congress had in mind only "'contributions,' not speech," Reply Br. 33, but in fact Congress deliberately extended the prohibition beyond monetary donations. The accompanying House Report makes clear that, without Section 2339B, "the fungibility of financial resources *and other types of material support*" would permit individuals "to supply funds, *goods, or services* to an organization." *1995 House Report* 81 (emphasis added). Congress thus was concerned about the delivery of a broad array of material support, including the services that petitioners wish to provide. That Congress did not mention speech is only further evidence that Section 2339B is content-neutral: Congress cared generally about individuals rendering service to foreign terrorist organizations, regardless whether that service involved any expression.

c. Petitioners similarly assert that "[h]uman rights advocacy training and peacemaking are not fungible like money." Reply Br. 34. That assertion in fact underlies petitioners' entire case, but it is addressed to the wrong branch of government. Petitioners dispute (*id.* at 42-44) the idea that assisting terrorist organizations in the way they propose will endanger American lives and interests. But Congress has made a different judgment about the need to prevent aid to foreign terrorist organizations generally, and that judgment is entitled to respect. See, *e.g.*, *Turner II*, 520 U.S. at 195 ("In reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of Congress.'") (quoting *Turner I*, 512 U.S. at 665); *United States* v. *Eichman*, 496 U.S. 310, 314 (1990) (noting "the

37

deferential standard" of review that applies to "regulations of conduct containing both speech and nonspeech elements where 'the governmental interest is unrelated to the suppression of free expression'") (quoting *O'Brien*, 391 U.S. at 377).

That is especially so in this context because Section 2339B implicates sensitive national security and foreign affairs interests, to which a heightened degree of deference to Congress and the Executive Branch is warranted. See *Humanitarian Law Project* v. *Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) ("Because the judgment of how best to achieve that end [of combating terrorism] is strongly bound up with foreign policy considerations, we must allow the political branches wide latitude in selecting the means to bring about the desired goal."), cert. denied, 532 U.S. 904 (2001); see also *Haig* v. *Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Regan* v. *Wald*, 468 U.S. 222, 242 (1984).

Even taken on its own terms, petitioners' view on this score is at odds with itself. Petitioners broadly claim (Reply Br. 42-44) that training terrorist organizations in peacemaking and human rights advocacy will not undermine national security. But they conceded before the lower courts that Congress could constitutionally prohibit any and all forms of support to al Qaeda—presumably because such aid does pose a security danger. See Pet. C.A. Br. 32 n.13. Petitioners' position thus amounts to a claim that Congress may not extend the material support statute to additional terrorist organizations, including the PKK and LTTE. The basis for that claim, as the government noted in its opening brief (at 57), has nothing to do with the statute's sup-

38

posed vagueness, content-discrimination, or association-al effects. Rather, it is grounded in petitioners' policy judgment about aid to al Qaeda as compared with aid to other terrorist organizations. Petitioners' silence in response speaks volumes about the real basis of this lawsuit.

### B. The Statute Does Not Infringe Petitioners' Right Of Association

1. Petitioners contend (Reply Br. 36-39) that the material-support statute violates their right to associate with foreign terrorist organizations. But just as Section 2339B regulates conduct—the act of giving material support—regardless of its expressive content, so too it regulates such conduct regardless of simple membership in or association with foreign terrorist groups. It is therefore again subject to intermediate scrutiny under *O'Brien*. And it survives that scrutiny for essentially the same reason: it is narrowly tailored to advance important governmental interests unrelated to the suppression of association. See Gov't Br. 59-61. Petitioners' only answer to these points is to misstate the extent of what Section 2339B prohibits.

Petitioners assert that by "effectively outlawing all 'concerted activity,'" Section 2339 "penalize[s] virtually *anything* one might do in association with a designated group." Reply Br. 36. That assertion ignores the point, made by both the court of appeals and the government, that "[t]he statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group." *Humanitarian Law Project*, 205 F.3d at 1133; see Gov't Br. 15. Rather, what the statute "prohibits is the act of giving material support, and there is no constitutional right

39

to facilitate terrorism." *Humanitarian Law Project*, 205 F.3d at 1133. Petitioners are therefore incorrect that Section 2339 penalizes "association plus something more." Reply Br. 38. What the statute penalizes is only the "something more"—*i.e.*, not mere membership or association, but only the act of rendering material support, in the form of property or services, to foreign terrorists.

2. Petitioners are also incorrect that "the government simply redefines 'peaceably assembling with members of the PKK and LTTE for lawful discussion' of human rights advocacy and peacemaking as a 'service.'" Reply Br. 37. The government made clear in its opening brief that "Section 2339B * * * does not prevent petitioners from peaceably assembling with members of the PKK and LTTE for lawful discussion." Br. 61. Petitioners may join the PKK and LTTE, gather with those groups' members, and discuss subjects of mutual interest. Petitioners filed the present suit for injunctive relief, however, because they want to do more than engage in discussion with terrorist groups. Specifically, petitioners want to train the PKK and LTTE on how to appear before international bodies; assist those groups at international meetings and conferences; and offer medical care, economic development services and information technology to those groups and their members. J.A. 58-63.

That fact distinguishes the present case from *De Jonge* v. *Oregon*, 299 U.S. 353 (1937). The defendant in *De Jonge* was not charged with the kind of acts that petitioners wish to perform. Rather, "[h]is sole offense as charged, and for which he was convicted and sentenced to imprisonment for seven years, was that he had assisted in the conduct of a public meeting, albeit other-

40

wise lawful, which was held under the auspices of the Communist Party." *Ibid.* This Court set aside the defendant's conviction, holding that he could not be punished solely for exercising his First Amendment right to engage in "peaceable assembly for lawful discussion." *Id.* at 365. Section 2339B accords with that principle: it does not prohibit petitioners from peaceably assembling with foreign terrorist organizations for lawful discussion. Nothing in *De Jonge* suggests that Congress may not prohibit petitioners from the additional act, separate from peaceable discussion, of providing material support to groups with a demonstrated willingness to engage in terrorism.

3. Finally, petitioners ignore the effect of the international context on their claims. Although this Court has not confronted the issue in the context of associational rights, this Court and other courts have recognized the "longstanding right of the sovereign to protect itself." *United States* v. *Ramsey*, 431 U.S. 606, 616 (1977). As a corollary to that right, this Court and other courts have consistently recognized the authority of the political Branches to restrict individuals from dealing with foreign governments whose actions are deemed to be inimical to American interests. See, *e.g.*, *Wald*, 468 U.S. at 242-243 (rejecting Fifth Amendment challenge to President's decision to curtail travel to Cuba); *Zemel* v. *Rusk*, 381 U.S. 1, 16-17 (1965) (holding that a United States citizen lacked any First Amendment right to travel to Cuba to gather information); *Veterans & Reservists for Peace in Vietnam* v. *Regional Comm'r of Customs*, 459 F.2d 676, 681-684 (3d Cir.) (upholding Trading with the Enemy Act and Foreign Assets Control Regulations against First Amendment claim to re-

41

ceive foreign literature), cert. denied, 409 U.S. 933 (1972).

The principle is as relevant to foreign terrorist organizations as to foreign governments: the foreign affairs powers of the political Branches include substantial authority, of just the kind Congress exercised in enacting the material-support statute, to restrict individuals from providing aid to foreign entities that threaten harm to this Nation's interests. See *Zemel*, 381 U.S. at 16 ("[T]he restriction which is challenged in this case is supported by the weightiest considerations of national security."); *Regan*, 468 U.S. at 242 ("Our holding in *Zemel* was merely an example of this classical deference to the political branches in matters of foreign policy."); *ibid.* (upholding Cuban travel ban as "justified by weighty concerns of foreign policy"). Individuals are subject to limitations in their relations with foreign governments and entities that differ from any found in the domestic setting. See *Dames & Moore* v. *Regan*, 453 U.S. 654 (1981). So even assuming that petitioners have some right of association to provide material support to domestic terrorist organizations, no such right should exist in the international context. And because the speech rights that petitioners have asserted in this case largely collapse into their claim of associational rights (given that the material support statute does not limit their independent advocacy), petitioners' speech claims fail for the same reason.

42

## III. THE MATERIAL-SUPPORT STATUTE'S RESTRICTIONS ON PROVIDING AID DO NOT REQUIRE SPECIFIC INTENT TO FURTHER THE TERRORIST ORGANIZATION'S UNLAWFUL ACTIVITIES

1. Before the lower courts, petitioners claimed that the material-support statute violates the Fifth Amendment's Due Process Clause unless it is interpreted to require specific intent to further a terrorist organization's unlawful activities. Before this Court, petitioners relegate that claim to a pair of footnotes (Br. 43 n.23; Reply Br. 36 n.17) that seek to incorporate by reference their arguments before the court of appeals. That strategy "is not enough to raise the question fairly" for this Court's consideration. *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 735 n.24 (2004).

Before this Court, petitioners press a different argument: that interpreting the material-support statute to require proof of specific intent would avoid resolution of all their constitutional claims. Contrary to their contention (Reply Br. 39 n.19), petitioners did not raise that argument below. The "constitutional infirmity" that they previously urged the court of appeals to avoid was imposing guilt by association in violation of the Fifth Amendment. Pet. C.A. Reply Br. 11-19; see Pet. C.A. Br. 19-37. That is precisely the claim that petitioners have failed to preserve here.

2. As the government has explained (Br. 63), petitioners' proposed specific intent requirement would not cure the First Amendment problems that they perceive. Petitioners agree with this much, saying only that if the challenged provisions are interpreted to require specific intent, "the injunction against applying the provisions to plaintiffs' proposed speech could be sustained on statutory grounds," and the Court would not have to reach

43

the constitutional questions in this case. Reply Br. 40. But the government has not conceded that all the petitioners currently lack, or will lack in the future, the specific intent to further unlawful terrorist activities. See Anti-Defamation League Amicus Br. 23 (describing how one of the petitioners, the World Tamil Coordinating Committee, assists in raising funds for the LTTE). If petitioners have this intent, their avoidance strategy will avoid nothing at all in this case (let alone in any others): they will continue to press their vagueness claims.

3. Nor is petitioners' proposal to amend the statute as modest as they try to make it appear. Petitioners argue that this Court should construe "the challenged provisions" to require specific intent. Reply Br. 40. But they do not explain why a specific intent requirement would apply only to challenged terms like "training," "expert advice or assistance," "personnel," or "service." Earlier in this litigation, petitioners sought to give financial support to the PKK and LTTE, see *id.* at 32 n.14; they do not concede (*ibid.*) that the statute is constitutional as applied to monetary contributions; and nothing will prevent others from arguing in the future that monetary contributions also have a communicative element. By petitioners' logic, any provision of the statute capable of reaching conduct with an expressive component should require proof of specific intent.

Moreover, petitioners incorrectly argue that this Court can construe the challenged terms to require specific intent only when they are "applied to speech." Reply Br. 40; see *id.* at 41-42. But in *Clark* v. *Martinez*, 543 U.S. 371 (2005), this Court held that when a statute is given a limiting construction to avoid constitutional concerns, that construction applies to future cases "whether or not those constitutional problems pertain to

44

the particular litigant before the Court." *Id.* at 381. Contrary to petitioners' proposal, the meaning of the terms in the material-support statute cannot vary depending on whether they are being "applied to speech." If petitioners are correct, then all prosecutions for rendering particular types of material support to foreign terrorists will require proof of specific intent.

4.  Finally, and most importantly, petitioners' interpretation conflicts with Congress's intent. Congress adopted a specific intent requirement in Sections 2339A and 2339C, but not in Section 2339B. Petitioners argue (Reply Br. 41-42) that there is no evidence Congress deliberately rejected such a requirement in Section 2339B, but that is not the case. Congress amended Section 2339B years after the enactment of Sections 2339A and 2339C, yet it opted for a different scienter requirement that does not require specific intent—and it did so in the face of a judicial conflict over that very issue. See Gov't Br. 65. Congress apparently thought that Section 2339A's prohibition on providing material support to terrorists was not sufficiently effective, and it therefore chose not to replicate the provision's specific intent requirement. See CACL Amicus Br. 8-9. Indeed, if Section 2339B were interpreted to include a specific intent requirement, it would become almost wholly duplicative of Section 2339A. In those circumstances, petitioners' request for avoidance amounts to little more than "a license * * * to rewrite language enacted by the legislature." *Albertini*, 472 U.S. at 680.

\* \* \* \* \*

45

The judgment of the court of appeals should be reversed insofar as it held certain terms in Sections 2339A and 2339B unconstitutionally vague and in all other respects affirmed.

Respectfully submitted.

ELENA KAGAN
*Solicitor General*

FEBRUARY 2010

Blank Page